UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NORTHWEST IMMIGRANT RIGHTS PROJECT, et al., | CASE NO. C15-0813JLR |
| Plaintiffs, | ORDER |
| v. | |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, et al., | |
| Defendants. | |

## I.   INTRODUCTION

This matter comes before the court on two motions:  (1) a motion to dismiss (MTD (Dkt. # 69)) by Defendants United States Citizenship and Immigration Services ("USCIS"); the Department of Homeland Security ("DHS"), which oversees USCIS; Leon Rodriguez, the Director of USCIS, in his official capacity; and Jeh Johnson, the Secretary of DHS, in his official capacity; and (2) a motion for class certification by

1     Plaintiffs Wilman Gonzalez Rosario, L.S., K.T., A.A., Karla Diaz Marin, Antonio

2     Machic Yac, Faridy Salmon, Jaimin Shah, Marvella Arcos-Perez, Carmen Osorio

3     Ballesteros, and W.H. (collectively, "Individual Plaintiffs") (MCC (Dkt. # 59)).[1] Two

4     non-profit organizations that serve putative class members, Plaintiffs Northwest

5     Immigrant Rights Project ("NWIRP") and The Advocates for Human Rights ("the

6     Advocates") (collectively, "Organizational Plaintiffs"), and Individual Plaintiffs oppose

7     the motion to dismiss.  (MTD Resp. (Dkt. # 73).)  Defendants oppose Individual

8     Plaintiffs' motion for class certification.  (MCC Resp. (Dkt. # 72).)

9         Having considered the submissions of the parties, the appropriate portions of the

10    record, the relevant law, and having held oral argument on September 7, 2016, the court

11    GRANTS in part and DENIES in part Defendants' motion to dismiss, DENIES Plaintiffs'

12    motion for class certification without prejudice, and GRANTS Plaintiffs leave to renew

13    their motion for class certification within 30 days of the date of this order.

14                  **II.   BACKGROUND**

15         Through this putative injunctive class action, Plaintiffs seek to compel USCIS to

16    abide by regulatory deadlines for adjudicating applications for employment authorization

17    documents ("EADs") filed by noncitizens.  (*See generally* Am. Compl. (Dkt. # 58).)

18

19

20       [1] In the court's February 10, 2016, order, the court "t[ook] its cue from Plaintiffs' briefing" and "shortened the last names of Ms. Arcos-Perez and Ms. Osorio-Ballesteros" to Ms. Arcos and Ms. Osorio, respectively.  (2/10/16 Order (Dkt. # 55) at 2 n.1.)  For consistency, the court continues to use those shortened names herein.  However, in their briefing on the instant motions, Plaintiffs do not shorten the names of Individual Plaintiffs.  (*See generally* MCC; MTD Resp.)  Accordingly, the court retains the full last names for Individual Plaintiffs besides Ms. Arcos and Ms. Osorio.

## A.      Regulatory Structure

For an alien to be eligible to work in the United States, the alien must file Form I-765 with DHS and obtain an EAD.  (Am. Compl. ¶¶ 3-4; Instructions for I-765 ("I-765 Instructions"), U.S. Customs and Immigration Services (Nov. 4, 2015), *available at* https://www.uscis.gov/sites/default/files/files/form/ i-765instr.pdf.[2]  USCIS, an agency within DHS, is responsible for adjudicating Form I-765.  (Am. Compl. ¶ 4.)  Federal regulations provide a timeline for USCIS to adjudicate EADs; that timeline is different for individuals seeking an initial EAD based on an underlying asylum application.  *See* 8 C.F.R. §§ 274a.13(d) (excluding from the 90-day deadline "initial application[s] for employment authorization under 8 CFR 274a.12(c)(8)"), 274a.12(c)(8) (covering aliens who have "filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208"), 208.7(a)(1) (providing a timeline for adjudicating asylum-based EAD applications).

The regulations confer unfettered discretion on USCIS to approve or deny EAD applications unless they are filed by an applicant for asylum.  8 C.F.R. § 274a.13(a)(1); *see also Guevara v. Holder*, 649 F.3d 1086, 1091-92 (9th Cir. 2011) ("[T]he authorization for such employment is not mandated."); *Kaddoura v. Gonzales*, No. C06-1402RSL, 2007 WL 1521218, at *5 (W.D. Wash. May 21, 2007) ("While plaintiff is correct that as an 'alien who has filed an application for adjustment of status' he is within the class of aliens 'eligible' for an EAD, under the plain language 8 C.F.R. §§ 274a.12

---

[2] Plaintiffs incorporate the I-765 Instructions into their amended complaint by reference. (*See* Am. Compl. ¶ 8.)

and 274a.13, his eligibility for an EAD resides within the discretion of USCIS and there is no appeal from the denial of the application.").  However, the same regulations use mandatory language when discussing the timeline for adjudicating such applications:

> USCIS will adjudicate the application within 90 days from the date of receipt of the application. . . .  Failure to complete the adjudication within 90 days will result in the grant of an employment authorization document for a period not to exceed 240 days.  Such authorization will be subject to any conditions noted on the employment authorization document. However, if USCIS adjudicates the application prior to the expiration date of the interim employment authorization and denies the individual's employment authorization application, the interim employment authorization granted under this section will automatically terminate as of the date of the adjudication and denial.

8 C.F.R. § 274a.13(d).  In sum, if USCIS has not adjudicated an EAD application within 90 days of receipt, the regulation requires USCIS to issue one or more interim EADs for 240 days or until USCIS adjudicates the EAD application, whichever comes first.

The regulations provide a different procedure for an asylum seeker applying for an initial EAD, which the court will refer to as an initial asylum EAD applicant.  *See* 8 C.F.R. §§ 208.7(a)(1), 274a.12(c)(8), 274a.13(d); *see also Carballo v. Meissner*, No. C00-2145, 2000 WL 1741948, at *2 (N.D. Cal. Nov. 17, 2000) (describing the process for an asylum applicant seeking an EAD).  Section 274a.13(a)(2) mandates that initial asylum EAD applications "shall be adjudicated in accordance with [Section] 208.7."  8 C.F.R. § 274a.13(a)(2).  After filing an application for asylum, an individual typically must wait 150 days before filing an initial EAD application.  *Id.* § 208.7(a)(1).  But there are exceptions to this rule.  For instance, if asylum is granted within 150 days, the asylee may apply for an EAD immediately thereafter.  *Id.*  Additionally, if asylum is denied at

1   any point, the applicant becomes ineligible for an EAD.  *Id.*  However, assuming an

2   individual's "asylum clock" runs for at least 150 days without delay caused by the

3   applicant, she may apply for an EAD while her asylum application pends.  *Id.*

4   §§ 208.7(a)(1)-(2), (4).  USCIS "shall have 30 days from the date of filing of the request

5   [sic] employment authorization to grant or deny that application," except that in no event

6   may USCIS grant the EAD prior to 180 days after the noncitizen files her asylum

7   application.  *Id.* § 208.7(a)(1); *see also* 8 U.S.C. § 1158(d)(2).  Section 208.7 is silent

8   about whether there is any consequence if USCIS fails to meet this 30-day adjudication

9   deadline.  *See* 8 C.F.R. § 208.7(a)(1); *cf. id.* § 274a.13(d) (providing for interim EADs for

10  other EAD applicants if USCIS has not decided their EAD applications within 90 days).

11         Plaintiffs contest the manner in which USCIS applies these adjudication deadlines.

12  The instructions accompanying Form I-765, which USCIS provides, allow applicants

13  who "have not received a decision within 90 days," or "within 30 days of a properly filed

14  initial EAD application based on an asylum application," to "request interim work

15  authorization."  (*See* I-765 Instructions at 11.)  Plaintiffs contend this interpretation

16  impermissibly construes the regulatory timeline to be hortatory rather than mandatory.

17  (*See, e.g.*, Compl. ¶ 11.)  Applicants who have requested to qualify for the Deferred

18  Action for Childhood Arrivals program ("DACA")[3] also experience delay because

19

20         [3] DHS initiated DACA in 2012.  The program allows DHS to "exercise prosecutorial

21  discretion as appropriate" to defer deportation or other action against individuals who were
    brought to the United States as children and meet certain other criteria.  DACA Frequently

22  Asked Questions, U.S. Customs and Immigration Services (June 15, 2015), http://www.uscis.
    gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-

1   USCIS interprets the 90-day clock to begin only after DHS adjudicates an applicant's

2   DACA application.  (*See* I-765 Instructions at 1, 6, 11.)  Similarly, USCIS tolls the

3   asylum clock when an asylum applicant accepts deferred prosecution in deportation

4   proceedings, which postpones indefinitely the date on which that individual becomes

5   eligible to apply for an asylum-based EAD.  *See* Memorandum from the Principal Legal

6   Advisor ("11/17/11 Memo"), U.S. Immigrations and Customs Enf't, Case-by-Case

7   Review of Incoming and Certain Pending Cases (Nov. 17, 2011) at 3 n.5, *available at*

8   http://www.ice.gov/doclib/foia/prosecutorial-discretion/case-by-case-review-incoming-

9   certain-pending-cases-memorandum.pdf.[4]

10  **B.    Factual Allegations**

11          Based on this regulatory structure, Individual Plaintiffs seek to certify a

12  nationwide class consisting of three subclasses.  Each Individual Plaintiff seeks to serve

13  as a class representative of one of the three putative subclasses.  (*See* Am. Compl.

14  ¶¶ 89-91; MCC at 2.)  The three subclasses are:

15          Noncitizens who have filed or will file applications for employment
        authorization that were not or will not be adjudicated within the required
16          regulatory timeframe, comprising those who:

17  _____

18  questions (last visited August 31, 2016).  The court takes judicial notice of this background
    information "as it was made publicly available by government entities" and its accuracy is "not
    subject to reasonable dispute."  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir.
19  2010) (citing Fed. R. Evid. 201).

20          [4] Although a subsequent memorandum superseded the 11/17/11 Memo, the 11/17/11
    Memo's provisions on administrative closure for EAD purposes remain in effect.  *See*
21  Memorandum from the Sec'y ("11/20/14 Memo"), Dep't of Homeland Sec., Policies for the
    Apprehension, Det., and Removal of Undocumented Immigrants (Nov. 20, 2014) at 5-6,
    *available at* http://www.dhs.gov/sites/default/files/publications/14_1120_memo_
22  prosecutorial_discretion.pdf; (*see also* MTD at 9 n.2.)

1. Have filed or will file applications for employment authorization under 8 C.F.R. § 274a.13, excluding initial applications based on pending asylum applications or requests to renew Deferred Action for Childhood Arrivals, but who have not received or will not receive a grant or denial of their EAD applications within 90 days of filing, and who are entitled or will be entitled to interim employment authorization under 8 C.F.R. § 274a.13(d), but who have not received or will not receive interim employment authorization. Applications for employment authorization based on Deferred Action for Childhood Arrivals, U or T visa applications, and self-petitions under the Violence Against Women Act are excluded until USCIS has determined eligibility for the underlying immigration benefit or granted deferred action (the "90-Day Subclass"); or

2. Are asylum applicants who have filed or will file initial applications for employment authorization under 8 C.F.R. § 208.7, but who, absent any applicant-caused delay, have not received or will not receive a grant or denial of their EAD applications within 30 days of filing, and who have not received or will not receive interim employment authorization (the "30-Day Subclass"); or

3. Have filed or will file applications for employment authorization under 8 C.F.R. § 274a.13 on the basis of requests to renew Deferred Action for Childhood Arrivals, but who have not received or will not receive a grant or denial of their EAD applications within 90 days of filing, and who are entitled or will be entitled to interim employment authorization under 8 C.F.R. § 274a.13(d), but who have not received or will not receive interim employment authorization (the "DACA Renewal Subclass").

(Am. Compl. ¶ 88; *see also* MCC at 2.)  For background, the court briefly recounts Plaintiffs' factual allegations.[5]

1.  Putative Representatives of the 90-Day Subclass

Mr. Gonzalez Rosario, L.S., K.T., Ms. Diaz Marin, Ms. Salmon, Mr. Shah, and Ms. Arcos seek to represent the 90-Day Subclass.  (Am. Compl. ¶ 89.)

_____

[5] Rather than summarizing the factual evidence provided in conjunction with Individual Plaintiffs' motion for class certification, the court discusses that evidence as relevant to the court's analysis of class certification.  *See infra* § III.B.

1   　　　　On March 10, 2015, USCIS granted Mr. Gonzalez Rosario deferred action based

2   on his petition for "U Nonimmigrant status." (*Id.* ¶ 46.) He filed an EAD application on

3   April 27, 2015, and as of 90 days after he filed the application, USCIS had not

4   adjudicated that application or granted Mr. Gonzalez Rosario an interim EAD. (*Id.* ¶ 47.)

5   As of the filing of the amended complaint, he had not been granted an EAD. (*See id.*

6   ¶ 49.)

7   　　　　Like Mr. Gonzalez Rosario, Ms. Diaz Marin filed a petition for U Nonimmigrant

8   status and an EAD application. (*Id.* ¶ 59.) Ms. Diaz Marin filed both the petition and the

9   application on March 18, 2014. (*Id.*) On February 24, 2015, USCIS granted Ms. Diaz

10  Marin deferred action and indicated that she was eligible to apply for an EAD. (*Id.*) Ms.

11  Diaz Marin then filed a second EAD application on August 2, 2015. (*Id.* ¶ 60.) As of the

12  filing of the amended complaint, more than 90 days had passed since Ms. Diaz Marin

13  filed her second EAD application and USCIS had not ruled on Ms. Diaz Marin's

14  application or granted her an interim EAD. (*Id.*)

15  　　　　Ms. Salmon also applied for an EAD after receiving deferred action. (*Id.* ¶ 64.) In

16  Ms. Salmon's case, USCIS granted deferred action on humanitarian grounds due to Ms.

17  Salmon's disabled daughter. (*Id.*) USCIS took more than 90 days to adjudicate the EAD

18  application, and as of the filing of the amended complaint had neither adjudicated the

19  EAD application nor issued an interim EAD. (*Id.* ¶ 65.)

20  　　　　Mr. Shah is a recent law school graduate who applied for employment

21  authorization based on his law school's recommendation that he receive post-completion

22  optional practical training beginning in March 2016. (*Id.* ¶ 68 (citing 8 C.F.R.

1   § 214.2(f)(11)(i)(B)(2)).)  Mr. Shah filed his EAD application on November 9, 2015, but

2   USCIS failed to adjudicate the EAD application within 90 days and had not adjudicated

3   the application as of the filing of the amended complaint.  (*Id.* ¶¶ 68-69.)

4        L.S. and K.T. are both asylum applicants who seek to renew their EADs.

5   (*Id.* ¶¶ 50, 53.)  L.S. filed his application for EAD renewal on November 16, 2015, K.T.

6   filed his application for EAD renewal on July 30, 2015, and as of the filing of the

7   amended complaint, USCIS had not adjudicated either renewal application.  (*Id.*)  The

8   principal difference between L.S. and K.T. is that USCIS did not schedule a biometrics

9   appointment for L.S., whereas USCIS did schedule a biometrics appointment for K.T.,

10  and he completed the biometrics.  (*Id.* ¶¶ 19-20.)

11       Ms. Arcos is also an asylum applicant who applied to renew her EAD.  (*Id.* ¶ 73.)

12  The court has previously summarized Ms. Arcos's allegations (2/10/16 Order at 8),

13  analyzed her claim (*id.* at 15-20), and dismissed Ms. Arcos's allegations for lack of

14  subject matter jurisdiction (*id.* at 37-38).  Ms. Arcos's current allegations largely mirror

15  those in the original complaint, which was operative when the court dismissed her

16  previous claims.  (*Compare* Compl. (Dkt. # 1) ¶¶ 38-39 *with* Am. Compl. ¶¶ 73-75.)  The

17  only update in the amended complaint is that since filing the original complaint, Ms.

18  Arcos filed another application to renew her EAD on October 15, 2015, and USCIS had

19  not adjudicated that application as of the filing of the amended complaint.  (Am. Compl.

20  ¶ 74.)

21  //

22  //

2.  <u>Putative Representatives of the 30-Day Subclass</u>

A.A., Mr. Machic Yac, and W.H. seek to represent the 30-Day Subclass.  (*Id.* ¶ 90.)  All three are asylum applicants seeking initial EADs.  (*Id.* ¶¶ 21, 23, 28.)  Each of the applicants filed his EAD application more than 150 days after USCIS received his asylum application.  (*Id.*)  Although more than 30 days had passed since they applied for EADs, neither A.A. nor Mr. Machic Yac had received a ruling as of the filing of the amended complaint.  (*Id.* ¶¶ 21, 23, 57, 62.)  However, USCIS approved W.H.'s EAD application on June 16, 2015—after the filing of the original complaint but before the filing of the amended complaint.  (*Id.* ¶¶ 28, 81.)

3.  <u>Putative Representative of the DACA Renewal Subclass</u>

Ms. Osorio seeks to represent the DACA Renewal Subclass.  (*Id.* ¶ 91.)  On December 29, 2014, she applied to renew her EAD in conjunction with her application to renew her DACA status.  (*Id.* ¶ 76.)  USCIS failed to adjudicate her application within 90 days and still had not done so when Ms. Osorio filed the initial complaint in this matter; USCIS did, however, grant Ms. Osorio an EAD on June 3, 2015.  (*Id.*)  USCIS interprets the regulation such that the 90-day adjudication clock did not begin until USCIS approved Ms. Osorio's DACA application, which had not yet occurred.  (2/10/16 Order at 28-29.)  After concluding that USCIS's interpretation is not plainly erroneous or inconsistent with the language of the applicable regulations, the court dismissed Ms. Osorio's claim for lack of subject matter jurisdiction.  (*Id.* at 29, 37-38.)

//

//

### 4.   Organizational Plaintiffs

NWIRP's mission is to "assist immigrants in obtaining legal status and the right to lawfully work in the United States." (Am. Compl. ¶ 82.)  According to NWIRP, many of its clients, who fall into "all three proposed subclasses," are "subject to unlawful delay" in their efforts to "receive EADs and interim EADs." (*Id.* ¶ 83.)  NWIRP alleges that "Defendants' untimely adjudication of EADS and failure to grant interim employment authorization" requires NWIRP to either assist clients in dealing with adjudicatory delays and serve fewer clients, or turn away clients dealing with adjudicatory delays. (*Id.* ¶ 84.) NWIRP seeks to compel Defendants to follow the adjudicatory deadline so that NWIRP may avoid this choice, which inevitably diverts resources and frustrates NWIRP's purpose. (*Id.*)

The Advocates' mission is to "provid[e] legal services to asylum seekers in Minnesota, North Dakota, and South Dakota." (*Id.* ¶ 85.)  In comparison to NWIRP, the Advocates represent a narrower swath of the putative class members—only initial asylum EAD applicants and renewal asylum EAD applicants. (*Id.*)  Nonetheless, like NWIRP, the Advocates allege that Defendants' indifference to the regulatory deadlines poses a choice to the Advocates that necessarily diverts resources and frustrates its purpose. (*Id.*)

## C.   Procedural History

Ms. Arcos, Ms. Osorio, W.H., and Organizational Plaintiffs filed this lawsuit as a putative class action on May 22, 2015. (Compl. (Dkt. # 1).)  On February 10, 2016, the court concluded it lacked subject matter jurisdiction over claims by Ms. Arcos, Ms.

1  Osorio, and Organizational Plaintiffs.  (2/10/16 Order.)  However, the court granted leave

2  to amend the complaint to remedy the deficiencies identified in the order.  (*Id.* at 37-39.)

3         On March 10, 2016, Plaintiffs filed an amended complaint.  (Am. Compl.)  The

4  amended complaint includes the five original plaintiffs and adds eight Individual

5  Plaintiffs.  (*Id.*)  Individual Plaintiffs seek to represent the 90-Day Subclass, the 30-Day

6  Subclass, and the DACA Renewal Subclass.  (Am. Compl. ¶ 88; *see also* MCC at 2.)

7  The day after filing their amended complaint, Individual Plaintiffs moved for class

8  certification.  (MCC.)  Several weeks later, Defendants moved to dismiss the amended

9  complaint.  (MTD.)

## III.   ANALYSIS

**A.   Defendants' Motion to Dismiss**

12         Defendants move to dismiss all claims on various grounds.  First, Defendants

13  argue that the law of the case doctrine should be applied to Ms. Arcos and Ms. Osorio's

14  claims.  (MTD at 11-12.)  Even if that doctrine does not apply, Defendants argue, the

15  court lacks subject matter jurisdiction over Ms. Arcos and Ms. Osorio's claims, and those

16  claims should accordingly be dismissed.  (*Id.* at 12-13.)  Second, Defendants seek

17  dismissal of W.H., A.A., and Mr. Machic Yac's claims on the basis that they fail to

18  identify a discrete action that USCIS was required to take and the court therefore lacks

19  subject matter jurisdiction under the APA.  (*Id.* at 14 (citing *Norton v. S. Utah Wilderness*

20  *All.*, 542 U.S. 55, 64 (2004)).)  Third, Defendants contend that if class certification fails,

21  Individual Plaintiffs' claims are moot and should be dismissed.  (*Id.* at 14-16 & n.3.)

22

Finally, Defendants argue that Organizational Plaintiffs lack standing and fail to state a claim. (*Id.* at 17-20.) The court addresses each of these arguments in turn.

1. Legal Standards

a. *Under Rule 12(b)(1)*

Defendants argue on several different bases that the court lacks subject matter jurisdiction over Plaintiffs' claims. A motion to dismiss for lack of subject matter jurisdiction is either facial or factual. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)). However, if the moving party "convert[s] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003) (citing *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)). In either instance, the party asserting its claims in federal court bears the burden of establishing subject matter jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

1    "To establish Article III standing, an injury must be 'concrete, particularized, and

2    actual or imminent; fairly traceable to the challenged action; and redressable by a

3    favorable ruling.'" *Clapper v. Amnesty Int'l USA*, --- U.S. ---, 133 S. Ct. 1138, 1147

4    (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).

5    More concisely, these requirements are known as injury, causation, and redressability.

6    *See Massachusetts v. E.P.A.*, 549 U.S. 497, 540 (2007) (Roberts, C.J., dissenting).

7    Because Plaintiffs seek "declaratory and injunctive relief only," "there is a further

8    requirement that they show a very significant possibility of future harm; it is insufficient

9    for them to demonstrate only a past injury." *San Diego Cty. Gun Rights Comm. v. Reno*,

10   98 F.3d 1121, 1126 (9th Cir. 1996).  The party asserting its claims in federal court bears

11   the burden of establishing standing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561

12   (1992).

13       Mootness is "the doctrine of standing set in a time frame:  The requisite personal

14   interest that must exist at the commencement of litigation (standing) must continue

15   throughout its existence (mootness)."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388,

16   397 (1980).  Even if the plaintiff had standing when the complaint was filed, a case

17   becomes moot if at any point it "does not satisfy the case-or-controversy requirement of

18   Article III, § 2 of the Constitution."[6]  *Caswell v. Calderon*, 363 F.3d 832, 836 (9th Cir.

19   2004).

20

21   _____

22       [6] The court discusses exceptions to mootness as they arise in its analysis.

ORDER- 14

1    The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, entitles a

2    "person suffering legal wrong because of agency action" to "judicial review thereof."  5

3    U.S.C. § 702.  The reviewing court must "decide all relevant questions of law, interpret

4    constitutional and statutory provisions, and determine the meaning or applicability of the

5    terms of an agency action." *Id.* § 706.  As relevant here, the court is empowered to

6    "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

7    However, such a claim "can proceed only where a plaintiff asserts that an agency failed

8    to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness*

9    *All.*, 542 U.S. 55, 64 (2004).  "Absent such an assertion, a Section 706(1) claim may be

10   dismissed for lack of jurisdiction." *Alvarado v. Table Mountain Rancheria*, 509 F.3d

11   1008, 1019-20 (9th Cir. 2007); *see also Gros Ventre Tribe v. United States*, 469 F.3d 801,

12   814 (9th Cir. 2006) (upholding the district court's dismissal of an APA claim for lack of

13   jurisdiction because the plaintiffs failed to demonstrate the government's obligation to

14   "take discrete nondiscretionary actions").  Furthermore, "when an agency is compelled

15   by law to act within a certain time period, but the manner of its action is left to the

16   agency's discretion, a court can compel the agency to act, but has no power to specify

17   what the action must be." *Norton*, 542 U.S. at 65 (clarifying that "law" can include

18   "agency regulations that have the force of law").

19       The Mandamus Act operates similarly in this context, empowering district courts

20   "to compel an officer or employee of the United States or any agency thereof to perform

21   a duty owed to the plaintiff."  28 U.S.C. § 1361; *see also Garcia v. Johnson*, No.

22   14-cv-1775-YGR, 2014 WL 6657591, at *5 (N.D. Cal. Nov. 21, 2014) ("The

1    jurisdictional dimensions of the APA and the Mandamus Act are considered to be

2    coextensive for purposes of compelling agency action that has been unreasonably

3    delayed."). "Although the exact interplay between these two statutory schemes has not

4    been thoroughly examined by the courts, the Supreme Court has construed a claim

5    seeking mandamus under the [Mandamus Act], 'in essence,' as one for relief under

6    [Section] 706 of the APA." *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir.

7    1997) (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4

8    (1986)); *see also Garcia*, 2014 WL 6657591, at *5 ("Where, as here, the relief sought is

9    identical under the APA and the mandamus statute, proceeding under one as opposed to

10   the other is not significant.").

11          *b.   Under 12(b)(6)*

12          When considering a motion to dismiss under Federal Rule of Civil Procedure

13   12(b)(6), the court construes the complaint in the light most favorable to the nonmoving

14   party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir.

15   2005). The court must accept all well-pleaded allegations of material fact as true and

16   draw all reasonable inferences in favor of the plaintiff. *See Wyler Summit P'ship v.*

17   *Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). "To survive a motion to

18   dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

19   claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

20   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Telesaurus*

21   *VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). "A claim has facial plausibility

22

1   when the plaintiff pleads factual content that allows the court to draw the reasonable

2   inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

3        The court, however, need not accept as true a legal conclusion presented as a

4   factual allegation. *Id.* at 678.  Although the pleading standard announced by Federal

5   Rule of Civil Procedure 8 does not require "detailed factual allegations," it demands more

6   than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing

7   *Twombly*, 550 U.S. at 555).  A pleading that offers only "labels and conclusions or a

8   formulaic recitation of the elements of a cause of action" will not survive a motion to

9   dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Id.*

10       Motions to dismiss for lack of statutory standing are reviewed for failure to state a

11   claim under Federal Rule of Civil Procedure 12(b)(6).  *See Vaughn v. Bay Envtl. Mgmt.,*

12   *Inc.*, 567 F.3d 1021, 1022, 1024 (9th Cir. 2008).

13       2.  Ms. Arcos and Ms. Osorio

14       Defendants argue that the law of the case doctrine bars Ms. Arcos's and Ms.

15   Osorio's claims (*id.* at 11-12), which the court previously dismissed for lack of subject

16   matter jurisdiction (2/10/16 Order at 14-20, 27-29).  Plaintiffs respond that the law of the

17   case doctrine is inapplicable (MTD Resp. at 3 n.4), but they concede that "the Court has

18   already ruled on Ms. Arcos-Perez and Ms. Osorio-Ballesteros' claims" (*id.* at 3 (citing

19   2/10/16 Order at 20, 29)).  Plaintiffs indicate that they merely intend to "preserve for

20   appeal their arguments that Ms. Arcos-Perez and Ms. Osorio-Ballesteros have standing

21   and that this [c]ourt has subject matter jurisdiction over their claims."  (*Id.*)

22

1         A review of the amended complaint reveals no new allegations regarding Ms.

2 Osorio or Ms. Arcos that alters the court's prior analysis. (*Compare* Compl. ¶¶ 18-19,

3 38-42 *with* Am. Compl. ¶¶ 26-27, 73-78.) Both individuals add the date on which USCIS

4 adjudicated their EAD applications (Am. Compl. ¶¶ 73 (indicating that USCIS denied

5 Ms. Arcos's EAD application on June 10, 2015), 76 (indicating that USCIS approved Ms.

6 Osorio's EAD application on June 3, 2015)), and Ms. Arcos added that she again applied

7 to renew her EAD on October 15, 2015, and USCIS had not adjudicated it as of the filing

8 of the amended complaint (*id.* ¶ 74). Ms. Arcos's additional allegations are irrelevant to

9 the court's conclusion that "an ineligible EAD-holder—who obtained her current EAD

10 only through error—[lacks] a legally cognizable right to compel adjudication of her

11 renewal application within a certain time period." (2/10/16 Order at 20.) Furthermore,

12 Ms. Arcos and Ms. Osorio make no new arguments in their briefing. (*See generally*

13 MTD Resp.; *see also id.* at 3 (referring exclusively to arguments made in prior briefing in

14 support of Plaintiffs' eventual grounds for appeal of the court's rulings regarding Ms.

15 Arcos and Ms. Osorio).) Accordingly, for reasons it has previously articulated, the court

16 dismisses Ms. Arcos's and Ms. Osorio's claims for lack of subject matter jurisdiction.[7]

17         3. <u>W.H., A.A., and Mr. Machic Yac</u>

18         W.H., A.A., and Mr. Machic Yac seek to represent the 30-Day Subclass. (Am.

19 Compl. ¶ 90.) Defendants contend that the court lacks subject matter jurisdiction over all

---

21
22      [7] Based on Ms. Arcos and Ms. Osorio's failure to remedy the jurisdictional deficiencies in their prior allegations, the court concludes amendment would be futile and declines to grant these plaintiffs leave to amend. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

1    three individuals' claims because pursuant to the regulations, USCIS is not "required" to

2    grant interim EADs to initial asylum applicants when USCIS fails to complete

3    adjudication within the 30-day period allotted.  (MTD at 14 (citing *Norton*, 542 U.S. at

4    64); *see also* MTD Reply (Dkt. # 74) at 1-2.)  Accordingly, Defendants argue that USCIS

5    is not required to perform the "discrete action" that W.H., A.A., and Mr. Machic Yac

6    seek to compel, and those three plaintiffs lack standing.  (MTD at 14; MTD Reply at

7    1-2.)

8         The court addressed this precise issue in rejecting Defendants' first effort to

9    dismiss W.H.'s claim:

> W.H. ultimately seeks one of two prospective remedies—either adjudicate
> his EAD application within 30 days or issue an interim EAD after 30
> days. . . .  The APA and the Mandamus Act contemplate the former
> remedy—compelling Defendants to act.  However, because the regulations
> applicable to asylum applicants make no reference to interim EADs, the
> court reserves judgment as to whether the latter remedy is available.

13   (2/10/16 Order at 26 n.19.)  As Plaintiffs argue, Defendants dispute the remedy available

14   to W.H., A.A., and Mr. Machic Yac.  (MTD Resp. at 4.)  But even if one remedy that

15   W.H., A.A., and Mr. Machic Yac seek—issuance of interim EADs—is unavailable,

16   another remedy that they seek—compelling USCIS to adjudicate EAD applications in a

17   timely fashion—is indeed available.  (*See* 2/10/16 Order at 26 n.19); *Norton*, 542 U.S. at

18   64 ("[W]hen an agency is compelled by law to act within a certain time period, but the

19   manner of its action is left to the agency's discretion, a court can compel the agency to

20   act, but has no power to specify what the action must be.").  Accordingly, the court

21

22

1    denies Defendants' motion to dismiss W.H.'s, A.A.'s, and Mr. Machic Yac's claims for

2    lack of subject matter jurisdiction.

3         4.  Mootness

4         Defendants "do not dispute mootness for class certification purposes," but they

5    contend that "[I]ndividual Plaintiffs cannot assert independent claims should class

6    certification fail because their claims have mooted out."  (MTD at 14 n.3.)  Individual

7    Plaintiffs contend that even if the court denies class certification, Individual Plaintiffs'

8    claims fall within one of several narrow exceptions to the mootness doctrine.  (MTD

9    Resp. at 7-9.)  The court need not reach either of these arguments because it denies class

10   certification without prejudice to renewing the motion and providing a further factual

11   record, and thus the inherently transitory exception to mootness still applies.[8]

12   _____

13   [8] On the other hand, if the court analyzes standing based on the date Plaintiffs filed the
     operative complaint, W.H.'s claims are not moot; rather, W.H. lacked standing as of the date

14   Plaintiffs filed the operative complaint.  (See Am. Compl. at 39 (indicating a filing date of March
     10, 2016), ¶ 28 (indicating that Defendants approved W.H.'s EAD application on June 16,

15   2015)); Geraghty, 445 U.S. at 397 (characterizing mootness as "the doctrine of standing set in a
     time frame: The requisite personal interest that must exist at the commencement of the litigation
     (standing) must continue throughout its existence (mootness)").  This conclusion would render

16   any exceptions to mootness inapplicable to W.H.
          In analogous situations, courts have taken different approaches to determining which

17   complaint governs subject matter jurisdiction.  Compare In re Atlas Van Lines, Inc., 209 F.3d
     1064, 1067 (8th Cir. 2000) ("[I]n cases where a plaintiff has filed an amended complaint, federal

18   courts must resolve questions of subject matter jurisdiction by examining the face of the
     amended complaint."), with Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198, 1202

19   n.3 (Fed. Cir. 2005) ("The initial standing of the original plaintiff is assessed at the time of the
     original complaint, even if the complaint is later amended."), and Lynch v. Leis, 382 F.3d 642,

20   647 (6th Cir. 2004) (quoting Cty. of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991)) ("A
     careful reading of County of Riverside demonstrates that the second amended complaint was

21   important not because it was the operative pleading, but because it was that complaint which
     named 'three additional plaintiffs' who were 'still in custody' at the time the complaint was filed,
     and who were the plaintiffs found to have standing by the Court. . . . Therefore, the operative

22   complaint is the one adding [the plaintiff] to the action, and the operative date is May 25,

1    In the class action context, inherently transitory claims "relate to [the plaintiff's]

2  standing at the outset of the case in order 'to preserve the merits of the case for judicial

3  resolution.'" *Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997); *see also Hernandez v.*

4  *Cty. of Monterey*, 70 F. Supp. 3d 963, 971-72 (N.D. Cal. 2014) ("If the inherently

5  transitory exception applies, the mootness determination merges with the standing

6  analysis as of the filing of the complaint. . . . If class claims fall within the [inherently]

7  transitory exception, a plaintiff need not file a motion for class certification before the

8  mooting of the plaintiff's claim for injunctive relief, unlike cases in which the

9  [inherently] transitory exception does not apply.").  Typically, the inherently transitory

10 doctrine ceases to apply when the court denies class certification, at which point the court

11 applies traditional mootness analysis.  However, because the court denies Plaintiffs'

12 motion for class certification without prejudice to refining the subclass definitions and

13 providing further evidence of commonality, *see infra* § III.B., the court rejects the

14 contention that the remaining Individual Plaintiffs' claims are moot at this juncture, *see*

15 *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1035 (5th Cir. 1981) (allowing

16 plaintiffs' renewed motion for class certification to relate back to the initial motion for

17 class certification because the district court's denial of the initial motion for class

18 certification was without prejudice and invited plaintiffs to present further evidence of

19 numerosity).  Until the court issues a final determination on the merits of class

20 

_____

21 2000 . . . .").  The court is persuaded that W.H.'s standing is based on the filing of his initial
   complaint, and the inherently transitory exception to mootness therefore saves his claim so long
22 as he remains a potential or certified class representative.

1   certification, the remaining Individual Plaintiffs constitute putative class representatives

2   whose claims are inherently transitory and relate back to the filing of the amended

3   complaint. *Id.*; (*see also* 2/10/16 Order at 30-31 & n.23.)  Accordingly, their claims are

4   not subject to dismissal on mootness grounds.

5        5.  Organizational Plaintiffs

6        Defendants contend that Organizational Plaintiffs again fail to plead sufficient

7   facts to confer standing.  (MTD at 17-18.)  Even if Organizational Plaintiffs allege

8   sufficient facts to confer standing, Defendants argue that Organizational Plaintiffs fail to

9   state a claim.  (*Id.* at 18-20.)  The court addresses these arguments in turn.

10        a.  *Constitutional Standing*

11        Organizational Plaintiffs can establish injury by demonstrating that they "suffered

12   'both a diversion of [their] resources and a frustration of [their] mission[s].'"  *La*

13   *Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088

14   (9th Cir. 2010) (citing *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir.

15   2002)).  Defendants mount a facial challenge to Organizational Plaintiffs' standing.  *See*

16   *Safe Air for Everyone*, 373 F.3d at 1039 ("In a facial attack, the challenger asserts that the

17   allegations contained in a complaint are insufficient on their face to invoke federal

18   jurisdiction."); (MTD at 17-18 (exclusively referencing the amended complaint).)

19   Defendants argue that the amended complaint "suffers from the same infirmities" as the

20   original complaint—namely, that it lacked "any indication of how much of

21   [Organizational Plaintiffs'] resources were diverted to assisting the types of claims that

22

ORDER- 22

1   survived [Defendants' prior motion to dismiss] or what parts of their mission were

2   frustrated."  (MTD at 17-18 (citing 2/10/16 Order at 33).)

3           The amended complaint meaningfully alters Individual Plaintiffs' allegations,

4   Organizational Plaintiffs' allegations, and the interplay between the two.  In the original

5   complaint, two Individual Plaintiffs lacked standing.  (*See generally* 2/10/16 Order.)

6   Dismissal of those Individual Plaintiffs' claims left a putative subclass without a viable

7   class representative.  (*Id.* at 35-36.)  Because "the complaint operate[d] on the assumption

8   that all three Individual Plaintiffs and the broad classes they s[ought] to represent ha[d]

9   the right to enforce various and varying federal regulations," and Organizational

10  Plaintiffs' allegations addressing organizational standing pertained generally to

11  "Defendants' untimely adjudication of EAD applications," the court concluded it was

12  "unclear the extent to which Organizational Plaintiffs' allegations confer standing."  (*Id.*

13  at 33.)

14          Here, the same two Individual Plaintiffs lack standing.  *See supra* § III.A.2.

15  (dismissing Ms. Arcos and Ms. Osorio).  However, nine Individual Plaintiffs remain

16  parties to this lawsuit.  (*See* Am. Compl. ¶¶ 18-25, 28.)  Those Individual Plaintiffs seek

17  timely issued EADs or interim EADs when the regulatory timeline for issuing the EADs

18  expires, and they seek to represent subclasses of similarly situated individuals.  (*See*

19  *generally id.*)  NWIRP alleges that its clients include Individual Plaintiffs in all three

20  proposed subclasses.  (*Id.* ¶ 83.)  The Advocates alleges its clients are asylum seekers (*id.*

21  ¶ 85), some of whom fall into the 90-Day Subclass and others of whom fall into the

22  30-Day Subclass (*id.* ¶¶ 5, 16; *see also* MTD Resp. at 11).

1        Organizational Plaintiffs' allegations support the inference USCIS's actions

2   diverted Organizational Plaintiffs' resources and frustrated their missions.  *See La*

3   *Asociacion de Trabajadores*, 624 F.3d at 1088.  NWIRP's mission is "to assist

4   immigrants in obtaining legal status and the right to lawfully work in the United States."

5   (Am. Compl. ¶ 82.)  When "EAD applications are not timely adjudicated, . . . NWIRP

6   staff must respond to client calls and walk-ins, explain the EAD process, the reasons for

7   delay, and the lack of remedies," among other diversions.[9]  (*Id.* ¶ 83.)  These tasks divert

8   resources from NWIRP's mission and thereby frustrate that mission.  Contrary to

9   Defendants' argument, at this stage NWIRP need not allege the magnitude of the

10  diversion.[10]  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 & n.21 (1982)

11  (concluding that dismissal on the pleadings for lack of organizational standing was

12  inappropriate but recognizing that the organizational plaintiff would nonetheless "have to

13  demonstrate at trial that it ha[d] indeed suffered impairment in its role of facilitating open

14  housing before it w[ould] be entitled to judicial relief").  NWIRP's current allegations

15

16      [9] The Ninth Circuit recently acknowledged that "under current precedent it might not be
    enough merely to choose to divert resources:  current precedent might be understood to require

17  the organization to show that it was 'forced' to divert resources to avoid or counteract an injury
    to its own ability to function."  *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 632 F. App'x

18  905, 909 (9th Cir. 2015) (citing *Comite de Jornaleros de Redondo Beach v. City of Redondo
    Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc)).  The court can plausibly infer that at least
    some of the alleged diversions forced Organizational Plaintiffs to respond, and thus at this stage

19  the court does not find that this line of cases undermines whether Organizational Plaintiffs have
    standing.

20
        [10] Defendants misapply the legal standard on a facial challenge to standing, as evidenced

21  by phrases such as "fails to show" and "do not show any evidence."  (MTD at 18.)  Plaintiffs
    need not "show" anything at the pleading stage; rather, their factual allegations, accepted as true,

22  and all reasonable inferences arising therefrom must support jurisdiction.  *See Leite*, 749 F.3d at
    1121.

1  permit a plausible inference that the magnitude of diversion is sufficient to confer

2  standing.  (*See* MTD at 18.)

3      The Advocates also alleges sufficient detail to confer standing.  The Advocates

4  states that its mission is "providing legal services to asylum seekers in Minnesota, North

5  Dakota, and South Dakota."  (Am. Compl. ¶ 85.)  Instead of providing legal services, the

6  Advocates "divert[s] scarce resources to resolving and addressing EAD adjudication

7  delays" for initial and renewal EAD requests.  (*Id.*)  The Advocates' "staff attorneys

8  spend considerable time calling and e-mailing USCIS, working with employees to hold

9  jobs open until their clients' EADs are renewed, intervening with the state on driver's

10  license issues, and working with agency liaison and congressional offices to try to obtain

11  EADs for their clients."  (*Id.*)  These allegations sufficiently show that the Advocates

12  must divert resources from advocating in support of asylum applications to addressing

13  and redressing untimely issued EADs.  Accordingly, the court concludes the Advocates

14  has pleaded sufficient facts to confer standing.[11]

15          b.  *Failure to State an APA Claim*

16      Defendants next argue that Organizational Plaintiffs fail to state an APA claim

17  because Organizational Plaintiffs do not fall within the zone of interests of the

18  Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and the related

19

20      [11] To be clear, the court concludes that Organizational Plaintiffs' pleadings withstand a
21  facial attack on standing.  *See Safe Air for Everyone*, 373 F.3d at 1039.  Defendants have not
   mounted a factual attack on standing, nor does the court see reason to raise the issue *sua sponte*
22  at this juncture, and accordingly the court expresses no opinion on that distinct question.  (*Cf.*
   MTD Reply at 5 n.1.)

regulations.[12]  (MTD at 18-20.)  To bring an APA claim, a plaintiff must assert an interest

that is "'arguably within the zone of interests to be protected or regulated by the statute'

that he says was violated."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v.*

*Patchak*, --- U.S. ---, 132 S. Ct. 2199, 2210 (2012) (quoting *Ass'n of Data Processing*

*Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)); *see also id.* ("[W]e have always

conspicuously included the word 'arguably' in the test to indicate that the benefit of any

doubt goes to the plaintiff.").  This inquiry "is not meant to be especially demanding."

*Id.* (citing *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  "The test forecloses

suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the

purposes implicit in the statute that it cannot reasonably be assumed that Congress

intended to permit the suit.'"  *Id.* (quoting *Clarke*, 479 U.S. at 399).

 The "pivotal question here is whether [DHS] intended to create a cause of action

encompassing [Organizational Plaintiffs'] claims when it" formulated the relevant

regulations.[13]  *Pit River Tribe*, 793 F.3d at 1156.  The court must answer this question

---

[12] Although "[t]he Supreme Court has often characterized the zone-of-interests test as a 'prudential standing' requirement," the Court recently "rejected the 'prudential standing' label and made clear that whether a plaintiff's claims are within a statute's zone of interests is not a jurisdictional question."  *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) (citing *Lexmark Int'l, Inc. v. Static Control Components*, --- U.S. ---, 134 S. Ct. 1377, 1387-88 (2014)).  Instead, it is a question of statutory standing, which does not implicate the court's subject matter jurisdiction.  *Id.*; *see also Nw. Requirements Utils. v. F.E.R.C.*, 798 F.3d 796, 807 n.9 (9th Cir. 2015).

[13] In advocating for and against the zone of interests, neither side differentiates between the INA and the regulations enacted thereunder.  The Ninth Circuit has cautioned that "courts should not use regulations to expand the zone of interest beyond what Congress intended."  *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 944 n.4 (9th Cir. 2005).  However, the Ninth Circuit issued that caution in a case in which the purported right to sue arose under the

1  "not by reference to the overall purpose of the [regulations] in question . . . , but by

2  reference to the particular provision of law upon which [Organizational Plaintiffs] rel[y]."

3  *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997).  The regulations governing asylum-based

4  EAD applicants are intended chiefly to "ensure that bona fide asylees are eligible to

5  obtain employment authorization as quickly as possible."  Inspection and Expedited

6  Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings;

7  Asylum Procedures, 62 Fed. Reg. 10,312, 10,318 (Mar. 6, 1997).  The EAD regulations

8  that apply to non-asylum-based applications are intended to address "the importance of

9  expeditious processing of employment authorization applications."  Control of

10  Employment of Aliens, 52 Fed. Reg. 16,216, 16,220 (May 1, 1987).

11       Defendants argue that these regulations were not "enacted to prevent organizations

12  that represent individuals applying for employment authorization from expending

13  resources to handle any delay in the adjudication of applicants."  (MTD at 20.)

14  Organizational Plaintiffs respond that the applicable regulations implicate their interests

15  because Organizational Plaintiffs "have an instrumental role to play in assisting their

16  clients to obtain EADs."  (MTD Resp. at 17 ("Organizational Plaintiffs play a significant

17  role in preparation and, where necessary, advocacy on behalf of clients in their

18  applications for EADs.").)  Because this role is "squarely within the ambit of the

19  regulations" (*id.*), Plaintiffs contend that they satisfy the zone of interests test.

20  _____

21  statute and not the regulations.  *Id.* at 939.  Where, as here, the purported substantive right arises
    from the regulation itself, it is appropriate to look to both the statute and the regulation that
22  underlies it.  *See Cox Cable Tuscon, Inc. v. Ladd*, 795 F.2d 1479, 1481 (9th Cir. 1986).

1     Organizational Plaintiffs base their argument that they fall within the zone of

2 interests on the implicit premise that their "role" equates to their "interest" in the

3 litigation.  (*See* MTD Resp. at 17.)  Organizational Plaintiffs cite no authority supporting

4 this premise.  In contrast, the Ninth Circuit and several district courts therein equate a

5 party's "interests" with the "injuries" that confer constitutional standing upon that party.

6 *See, e.g.*, *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001) ("In addition

7 to [Article III's standing] requirements, a plaintiff bringing suit under the Administrative

8 Procedure Act for a violation of [a statute] must show that his alleged injury falls within

9 the 'zone of interests' that [the statute] was designed to protect."); *Oberdorfer v. Jewkes*,

10 583 F. App'x 770, 773 (9th Cir. 2014) ("[The plaintiff]'s economic injury . . . suffices for

11 Article III standing but does not fall within [the statute]'s zone of interests.  [The

12 plaintiff]'s environmental injury . . . is within [the statute]'s zone of interests but will not

13 be redressed by a favorable decision, since the damage in question occurred in the past.");

14 *Yount v. Salazar*, No. CV11-8171 PCT-DGC, 2014 WL 4904423, at *6 (D. Ariz. Sept.

15 30, 2014) (citing *Lexmark*, 134 S. Ct. at 1387) (concluding that applying the

16 "single-injury requirement," which requires that the injury that confers constitutional

17 standing is also the injury that falls within the relevant statute's zone of interests,

18 comports with the purposes of the statutory standing doctrine—ascertaining and heeding

19 congressional intent); *Kanoa Inc. v. Clinton*, 1 F. Supp. 2d 1088, 1095 (D. Haw. 1998)

20 ("Plaintiff's injuries, economic losses, are not within the zone of interests that the

21 [statute] was enacted to protect.").

22

1    Organizational Plaintiffs' clients, who presumably resemble Individual Plaintiffs

2    and the putative classes they seek to represent, suffer injuries from delayed adjudication

3    of EADs.  (*See, e.g.*, Am. Compl. ¶¶ 49, 52, 55-56, 58, 61, 63, 66-67, 71, 81.)  These

4    injuries place those plaintiffs within the zone of interests of the relevant INA and

5    regulatory provisions.  *See* 52 Fed. Reg. at 16,216; 62 Fed. Reg. at 10,318.  However,

6    Organizational Plaintiffs allege a markedly different injury—diversion of scarce

7    resources—and that injury is the toehold that supports Organizational Plaintiffs' standing.

8    *See supra* § III.A.5.c.; (Am. Compl. ¶¶ 83-85.)  Supreme Court Justice Sandra Day

9    O'Connor, sitting as the Circuit Justice for the Ninth Circuit, made the following

10   observations about the Immigration Reform and Control Act ("IRCA") and the

11   regulations enacted thereunder:

12          IRCA was clearly meant to protect the interests of undocumented aliens,
            not the interests of organizations . . . .  Though such organizations did play
13          a role in the IRCA scheme—during the amnesty period, they were so-called
            "qualified designated entities," which were to "assis[t] in the program of
14          legalization provided under this section," [8 U.S.C.] § 1255a(c)(2)—there
            is no indication that IRCA was in any way addressed to their interests.  The
15          fact that the INS regulation may affect the way an organization allocates its
            resources . . . does not give standing to an entity which is not within the
16          zone of interests the statute meant to protect.

17   *I.N.S. v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301,

18   1305 (1993) (first alteration in original); *see also Immigrant Assistance Project of L.A.*

19   *Cty. Fed'n of Labor (AFL-CIO) v. I.N.S.*, 306 F.3d 842, 867 (9th Cir. 2002) (emphases in

20   original) (interpreting Justice O'Connor's opinion as holding "that the IRCA did not give

21   organizational plaintiffs standing to sue on their *own* behalf" but that organizational

22   plaintiffs had "standing to sue on behalf of their *members* whose claims are ripe"); *Situ v.*

ORDER- 29

1   *Leavitt*, No. C06-2841 THE, 2006 WL 3734373, at *10 (N.D. Cal. Dec. 18, 2006)

2   ("[T]he Court finds that the organizational plaintiffs in this case fail to satisfy the zone of

3   interests test because they have failed to rebut Defendant's argument that the Medicare

4   statutory scheme is intended to protect individuals, not advocacy organizations.").

5        Organizational Plaintiffs' claims are analogous to the claims that Justice O'Connor

6   confronted.  *See Legalization Assistance Project*, 510 U.S. at 1302 (characterizing the

7   organizational plaintiffs as "organizations that provide legal help to immigrants" and

8   "believe the INS interpreted" amnesty provisions "too narrowly").  Organizational

9   Plaintiffs do not argue that the applicable INA and regulatory provisions provide recourse

10  for advocates' diverted resources in addition to protection for EAD applicants.[14]  (*See*

11  MTD Resp. at 15-17.)  Nor can the text of the relevant provisions be fairly read to

12  implicate Organizational Plaintiffs' interest in the efficient use of resources.  Finally, the

13  regulatory history shows that the regulations were intended to promote expediency and

14  predictability for the sake of EAD applicants.  *See* 52 Fed. Reg. at 16,216; 62 Fed. Reg.

15  at 10,318.

16        Accordingly, even though the zone of interests inquiry is not demanding, the court

17  concludes that Organizational Plaintiffs' interests are unarguably "so marginally related

18  _____

19      [14] Elsewhere, Organizational Plaintiffs argue that they have third-party standing to sue on
    behalf of Individual Plaintiffs.  (MTD Resp. at 18-19 (arguing that the court "should reject
20  Defendants' argument that the Organizational Plaintiffs have not adequately stated a mandamus
    claim" for two reasons:  "[f]irst," because it is an issue of prudential standing, and "[s]econd,"
21  because "Organizational Plaintiffs meet the prudential standing requirement for asserting the
    rights of third parties").)  Because Organizational Plaintiffs direct that argument only toward
22  their Mandamus Act claim, the court declines to consider it as applied to the APA claim.  *See
    infra* § III.A.5.c.

1   to . . . the purposes implicit in the [regulation] that it cannot reasonably be assumed that

2   Congress [and the regulators] intended to permit the suit." *Match-E-Be-Nash-She-Wish*,

3   132 S. Ct. at 2210.  The court therefore dismisses Organizational Plaintiffs' APA claim

4   for failure to state a claim.

5                   *c.  Failure to State a Mandamus Act Claim*

6          Defendants also seek dismissal of Organizational Plaintiffs' Mandamus Act claim

7   on the basis that Defendants owe no duty to Organizational Plaintiffs and therefore

8   Organizational Plaintiffs lack statutory standing.  The Mandamus Act confers jurisdiction

9   on the court "to compel an officer or employee of the United States or any agency

10  thereof" to take certain actions.  28 U.S.C. § 1361.  However, the court may only compel

11  the officer or employee to "perform a duty owed to the plaintiff."  *Id.*  The Ninth Circuit

12  has concluded "a duty is 'owed to the plaintiff' if the plaintiff falls within the 'zone of

13  interests' protected by the underlying statute."  *Silveyra v. Moschorak*, 989 F.2d 1012,

14  1014 n.1 (9th Cir. 1993) (citing *Jarecki v. United States*, 590 F.2d 670, 675 (7th Cir.

15  1979)), *superseded by statute on other grounds*, 8 U.S.C. § 1252(i); *see also Blackman v.

16  Taxdahl*, No. CV F 04 6389 AWI NEW (DLB) P, 2007 WL 613862, at *3 (E.D. Cal.

17  Feb. 27, 2007).

18         The Ninth Circuit, reasoning that "both the APA and the Mandamus Act are

19  'ordinary element[s] of administrative enforcement schemes,' and both provide a basis

20  for compelling an agency to take action which by law it is required to take," has

21  concluded that there is "no reason to infer differing [statutory] standing requirements for

22  these two means of compelling wrongfully withheld agency action."  *See Soler v. Scott*,

1    942 F.2d 597, 605 (9th Cir. 1991) (first alteration in original) (internal citations omitted),

2    *vacated on other grounds by Sivley v. Soler*, 506 U.S. 969 (1992); *see also*

3    *Hernandez-Avalos v. I.N.S.*, 50 F.3d 842, 846 (10th Cir. 1995) ("[B]ecause mandamus is

4    properly sought where government officials 'owe a duty' to the plaintiff, and because a

5    'duty' is 'owed' in the administrative context if the plaintiff's interest is within the 'zone

6    of interests' protected by the underlying statute, all a plaintiff seeking mandamus in

7    administrative litigation need show is that the interest he seeks to vindicate falls within

8    the statutory zone of interests."); *Giddings v. Chandler*, 979 F.2d 1104, 1110 (5th Cir.

9    1992) ("[S]tanding under the APA is determined by applying the same 'zone of interest'

10   test as applied to determine standing in the mandamus context.").  The court has

11   concluded that Organizational Plaintiffs do not fall within the zone of interests of the

12   applicable statute and regulations for purposes of their APA claim.  *See supra* § III.A.5.b.

13   By the same reasoning, Organizational Plaintiffs' Mandamus Act claim fails because

14   Defendants do not owe a duty to Organizational Plaintiffs.  *See* 28 U.S.C. § 1361.

15          Organizational Plaintiffs raise only one argument in support of their Mandamus

16   Act claim that they did not raise in support of their APA claim:  "Organizational

17   Plaintiffs meet the prudential standing requirement for asserting the rights of third

18   parties."  (MTD Resp. at 18); *see also supra* n.14.  Organizational Plaintiffs therefore

19   argue that even if Defendants do not owe them a duty, Defendants owe a duty to

20   Organizational Plaintiffs' clients, and Organizational Plaintiffs should be treated as

21   falling within the zone of interests because they have standing to raise their clients'

22   rights.

1    Generally, a party "must assert his own legal rights and interests, and cannot rest

2    his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422

3    U.S. 490, 499 (1975). However, this rule is not absolute, and the Supreme Court has

4    authorized third-party standing when "the party asserting the right has a 'close'

5    relationship with the person who possesses the right" and "there is a 'hindrance' to the

6    possessor's ability to protect his own interests."[15] *Kowalski v. Tesmer*, 543 U.S. 125, 129

7    (2004); *see also id.* at 130 (emphasis in original) (indicating that the Supreme Court has

8    more leniently allowed third-party standing in the First Amendment context and "when

9    enforcement of the challenged restriction *against the litigant* would result indirectly in

10   the violation of third parties' rights," but otherwise has "not looked favorably upon

11   third-party standing").

12   Here, Organizational Plaintiffs do not have a close relationship with the class they

13   seek to represent. Organizational Plaintiffs point out that "courts have in some cases

14   found third-party standing for attorneys representing clients." (MTD Resp. at 19.)

15   However, the Supreme Court has held that a "hypothetical attorney-client relationship"

16   between attorneys and "as yet unascertained Michigan criminal defendants 'who will

17   request, but be denied, the appointment of appellate counsel'" is an insufficient

18   attorney-client relationship to support third-party standing. *Kowalski*, 543 U.S. at

19   130-31. Much like in *Kowalski*, Organizational Plaintiffs seek to assert the rights of an

20

21   [15] The party asserting the right must also have Article III standing, *see Caplin &*

22   *Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989), which Organizational
     Plaintiffs have adequately alleged, *see supra* § III.A.5.a.

ORDER- 33

1    "as yet unascertained" class of EAD applicants "who will request" and fail to timely

2    receive EAD or interim EAD approval.  *Id.*  This relationship is insufficient to confer

3    third-party standing on Organizational Plaintiffs.

4         Furthermore, Organizational Plaintiffs' clients are not sufficiently hindered in their

5    ability to protect their own interests.  As demonstrated by this lawsuit, Organizational

6    Plaintiffs' clients are capable of filing a lawsuit to vindicate their rights.  (*See* Compl.)

7    Each Individual Plaintiff has obtained the individual relief that she or he sought.  *See*

8    *Pruitt v. City of Arlington*, No. C08-1107MJP, 2009 WL 1505267, at *2 (W.D. Wash.

9    May 28, 2009) (concluding that where a third party was "also a plaintiff in th[e] lawsuit,

10   her ability to protect her own interests [wa]s not hindered"); *see also Suciu v.*

11   *Washington*, No. 12-12316, 2012 WL 4839924, at *4 (E.D. Mich. Oct. 11, 2012)

12   ("Prisoners may pursue relief through the grievance process and through the courts.

13   These methods would be effective to resolve the issue before any loss of standing.").

14   Furthermore, as Defendants acknowledge, the "inherently transitory" exception to the

15   mootness doctrine enables Individual Plaintiffs to seek injunctive relief on behalf of a

16   putative class, even after Defendants adjudicate their EAD applications.  (*See* MTD at 14

17   n.3); *supra* § III.A.4.  The permissive nature of standing doctrine and its temporal

18   permutations in the context of putative class actions further undermines the notion that

19   Organizational Plaintiffs' clients suffer a sufficient hindrance to filing this lawsuit.

20   Finally, difficulty in or reticence to obtaining an attorney does not constitute "the type of

21   hindrance necessary to allow another to assert" EAD applicants' rights.  *Kowalski*, 543

22

1    U.S. at 569. Accordingly, the infrequency with which plaintiffs file suits such as this one

2    is also unpersuasive evidence of a hindrance. (*See* MTD Resp. at 19.)

3          This case thus does not resemble those in which courts have concluded that a third

4    party's ability to protect its own interests was sufficiently hindered to warrant third-party

5    standing. *See, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 411 ("[W]e have permitted criminal

6    defendants to challenge their convictions by raising the rights of third parties. . . . By

7    similar reasoning, we have permitted litigants to raise third-party rights in order to

8    prevent possible future prosecution."); *Singleton v. Wulff*, 428 U.S. 106, 117 (1976)

9    (allowing physicians to sue on behalf of women seeking abortions after identifying

10   "several obstacles" to women asserting their own rights, including the chilling effect of

11   "the publicity of a court suit" and "imminent mootness"); *Homeaway Inc. v. City & Cty.*

12   *of S.F.*, No. 14-cv-04859-JCS, 2015 WL 367121, at *11 (N.D. Cal. Jan. 27, 2015)

13   ("Decisions that have found a sufficient hindrance generally identify more structural

14   concerns than are present [in a business-customer relationship]."). Accordingly, the court

15   rejects the contention that Organizational Plaintiffs have statutory standing to pursue their

16   Mandamus Act claim on behalf of third parties.

17         The court concludes that Organizational Plaintiffs lack statutory standing to assert

18   their Mandamus Act claim and cannot circumvent that conclusion by asserting the rights

19   //

20   //

21   //

22   //

1    of their clients.[16]  Therefore, the court dismisses Organizational Plaintiffs' Mandamus

2    Act claim.

3    **B.      Plaintiffs' Motion for Class Certification**

4           Plaintiffs move to certify three subclasses.  As a threshold matter, the court has

5    dismissed Ms. Osorio, who served as the only putative representative of the DACA

6    Renewal Subclass.  (Am. Compl. ¶ 91; MCC at 6); *supra* § III.A.2.  Accordingly, the

7    court denies Plaintiffs' motion to certify the DACA Renewal Subclass for lack of

8    adequate representation.  However, putative class representatives remain for the 90-Day

9    Subclass and the 30-Day Subclass, and the court analyzes whether class certification is

10   appropriate as to those subclasses.

11          1.   Legal Standard

12          "Class certification is governed by Federal Rule of Civil Procedure 23."

13   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).  Under Federal Rule of Civil

14   Procedure Rule 23(a), the party seeking certification must first demonstrate that "(1) the

15   class is so numerous that joinder of all members is impracticable; (2) there are questions

16   of law or fact common to the class; (3) the claims or defenses of the representative parties

17   are typical of the claims or defenses of the class; and (4) the representative parties will

18   _____

19          [16] The conclusion that Organizational Plaintiffs lack statutory standing under the APA
     and Mandamus Act is a determination of law and cannot be remedied by further allegations.

20   Accordingly, the court concludes that amendment of Organizational Plaintiffs' claims would be
     futile and dismisses those claims without leave to amend.  *See Cahill v. Liberty Mut. Ins. Co.*, 80

21   F.3d 336, 339 (9th Cir. 1996); *Kibby Road, LLC v. N. Tr. Co.*, No. 15-cv-00795-YGR, 2015 WL
     2198724, at *5 (N.D. Cal. May 11, 2015) (denying leave to amend because "th[e] case

22   present[ed] a straightforward disagreement as to a basic legal question, where the relevant
     facts . . . [we]re not in dispute").

1   fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  "Second,

2   the proposed class must satisfy at least one of the three requirements listed in Rule

3   23(b)."  *Dukes*, 564 U.S. at 345; *see also Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512

4   (9th Cir. 2013).  Here, Plaintiffs seek to certify a class under Rule 23(b)(2), which

5   requires that "the party opposing the class has acted or refused to act on grounds that

6   apply generally to the class, so that final injunctive relief or corresponding declaratory

7   relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2); (*see* MCC

8   at 6, 21.)  "Rule 23(b)(2) applies only when a single injunction or declaratory judgment

9   would provide relief to each member of the class."  *Dukes*, 564 U.S. at 360.

10          Rule 23 "does not set forth a mere pleading standard."  *Id.* at 350.  Rather,

11  "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the

12  prerequisites of Rule 23(a) have been satisfied."  *Id.* at 350-51 (internal quotation

13  omitted).  "[I]t may be necessary for the court to probe behind the pleadings before

14  coming to rest on the certification question."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S.

15  147, 160 (1982).  This is because "the class determination generally involves

16  considerations that are enmeshed in the factual and legal issues comprising the plaintiff's

17  cause of action."  *Id.* (internal quotation omitted).  Nonetheless, the ultimate decision

18  regarding class certification "involve[s] a significant element of discretion."  *Yokoyama*

19  *v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1090 (9th Cir. 2010).

20          2.  <u>Putative Subclasses</u>

21          Plaintiffs propose the following definition for the 90-Day Subclass:

22

ORDER- 37

> Noncitizens who have filed or will file applications for employment authorization that were not or will not be adjudicated within the required regulatory timeframe, comprising those who . . . [h]ave filed or will file applications for employment authorization under 8 C.F.R. § 274a.13, excluding initial applications based on pending asylum applications or requests to renew Deferred Action for Childhood Arrivals, but who have not received or will not receive a grant or denial of their EAD applications within 90 days of filing, and who are entitled or will be entitled to interim employment authorization under 8 C.F.R. § 274a.13(d), but who have not received or will not receive interim employment authorization. Applications for employment authorization based on Deferred Action for Childhood Arrivals, U or T visa applications, and self-petitions under the Violence Against Women Act are excluded until USCIS has determined eligibility for the underlying immigration benefit or granted deferred action.

(MCC at 2.)  Plaintiffs contend that this putative subclass constitutes individuals that are entitled pursuant to 8 C.F.R. § 274a.13(d) to receive an interim EAD or an adjudication of their EAD application within 90 days of submitting the application, but receive neither in a timely fashion.  (*Id.* at 3.)  Acknowledging that Section 274a.13(d) does not apply to all EAD applications, Plaintiffs exclude three types of EAD applications from their proposed definition (*see* MCC at 4):  (1) initial EAD applications based on a pending asylum application, *see* 8 C.F.R. §§ 208.7, 274a.12(c)(8); (2) EAD applications with a pending permanent residence application under the Haitian Refugee Immigration Fairness Act ("HRIFA"), 8 U.S.C. § 1151 et seq.; and (3) certain spouses of H-1B nonimmigrants, *see* 8 C.F.R. § 214.2(h)(9)(iv).

Plaintiffs propose the following definition for the 30-Day Subclass:

> Noncitizens who have filed or will file applications for employment authorization that were not or will not be adjudicated within the required regulatory timeframe, comprising those who . . . [a]re asylum applicants who have filed or will file initial applications for employment authorization under 8 C.F.R. § 208.7, but who, absent any applicant-caused delay, have not received or will not receive a grant or denial of their EAD applications

within 30 days of filing, and who have not received or will not receive interim employment authorization.

(MCC at 2.)  According to Plaintiffs, this subclass "is comprised of asylum applicants making their first application for an asylum-based EAD, also called an initial asylum EAD."  (*Id.* at 5.)  Plaintiffs contend that members of this class are entitled to adjudication of their EAD application within 30 days pursuant to 8 C.F.R. § 208.7(a)(1). (*Id.*)

Defendants oppose the 90-Day Subclass and the 30-Day Subclass on the same grounds.  First, Defendants restate the standing arguments that the court addressed above. (MCC Resp. at 8-12.)  Defendants then argue that Plaintiffs fail to satisfy the commonality, typicality, and adequacy requirements.  (*Id.* at 12-23.)

3.  Certification

Plaintiffs argue that their proposed subclasses satisfy all Rule 23(a) and Rule 23(b)(2) requirements.[17]  The court analyzes those requirements below.

_____

[17] For class actions proceeding under Rule 23(b)(3), courts require a putative lead plaintiff to show that the class definition is ascertainable in addition to the express requirements of Rules 23(a) and 23(b)(3).  *See O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).  However, the Ninth Circuit has not ruled on whether and to what extent this tacit ascertainability requirement applies to a class proceeding under Rule 23(b)(2), and courts are split on that issue.  *See Bee, Denning, Inc. v. Cap. All. Corp.*, No. 13-cv-02654-BAS(WVG), 2016 WL 3952153, at *4 (S.D. Cal. July 21, 2016) (collecting cases).  This court has previously adopted the rationale that "due to the unique characteristics of a Rule 23(b)(2) class, it is improper to require ascertainability."  *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1326 (W.D. Wash. 2015); *see also Bee, Denning, Inc.*, 2016 WL 3952153, at *4 (concluding that the majority approach "appears to favor either a lower standard for the ascertainability requirement or no requirement at all in the 23(b)(2) context").  In addition, Defendants do not contend that an ascertainability requirement applies or that the subclass definitions suffer from ascertainability flaws.  Accordingly, the court concludes that ascertainability presents no obstacle to class certification.

*a. Numerosity*

"The prerequisite of numerosity is discharged if 'the class is so large that joinder of all members is impracticable.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (quoting Fed. R. Civ. P. 23(a)(1)).  Plaintiffs note that "DHS has control of the information proving the impracticability of joinder and does not make such information available."  (MCC at 8.)  If DHS has such information, it is presumably available through discovery in this action.  Plaintiffs have apparently not obtained such information via discovery.

The USCIS Ombudsman's 2016 report indicates based on information from USCIS that "more than 2 million EAD applications were filed with the agency in FY 2015," and 449,307, or 22 percent, of those applications were adjudicated more than 90 days after filing.  U.S. Dep't of Homeland Sec., USCIS Ombudsman Annual Report 2016 [hereinafter, 2016 Ombudsman Report] at 61-62 & nn.474, 487 (June 29, 2016), *available at* https://www.dhs.gov/annual-report-congress ("While some delays are due to the customer's failure to file timely or provide required documentation, other delays occur through no fault of the customer.").  This evidence does not indicate how many of the 449,307 applications adjudicated after 90 days were timely—for instance, because they were subject to tolling.  However, Plaintiffs have provided sampled statistical evidence from numerous sources that demonstrates USCIS fails to timely adjudicate EAD applications for putative members of both subclasses.  (*See* MCC at 9 n.7 (collecting declarations).)  Furthermore, Defendants have conceded that USCIS has for the most part ceased granting interim EADs.  (*See* 2/10/16 Order at 7 n.6); *see also* 2016

1 Ombudsman Report at 61 ("Interim EADs are no longer issued by the agency, despite

2 regulatory language allowing for that option after 90 days.").

3       Based on this evidence, "general knowledge," and "common sense," the court can

4 infer that both putative subclasses are sufficiently large.  *Perez-Funez v. Dist. Dir., I.N.S.*,

5 611 F. Supp. 990, 995 (C.D. Cal. 1984).  Further, each putative subclass includes

6 "unnamed and unknown future" EAD applicants, and joinder of such "individuals is

7 inherently impracticable." *Jordan v. L.A. Cty.*, 669 F.2d 1311, 1320 (9th Cir. 1982),

8 *vacated on other grounds*, 459 U.S. 810.  Finally, Defendants do not argue that either

9 subclass is insufficiently numerous.  (*See generally* MCC Resp.)  The court therefore

10 concludes that the 90-Day Subclass and the 30-Day Subclass are both sufficiently

11 numerous to satisfy Rule 23(a)(1).

12       *b.   Commonality*

13       The requirement of "commonality" is met through the existence of a "common

14 contention" that is of "such a nature that it is capable of classwide resolution." *Dukes*,

15 564 U.S. at 350.  A contention is capable of classwide resolution if "the determination of

16 its truth or falsity will resolve an issue that is central to the validity of each one of the

17 claims in one stroke." *Id.*  Accordingly, "what matters to class certification . . . is not the

18 raising of common questions—even in droves—but, rather the capacity of a classwide

19 proceeding to generate common answers apt to drive the resolution of the litigation." *Id.*

20 This requirement is "construed permissively." *Hanlon*, 150 F.3d at 1019.  Accordingly,

21 "[a]ll questions of fact and law need not be common to satisfy the rule." *Id.*; *see also*

22 *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010).

1    Here, the answers to one legal question and one factual question will "drive the

2    resolution of the litigation." *Dukes*, 564 U.S. at 350. The legal question is whether

3    USCIS is legally obligated to adjudicate EAD applications within a certain timeframe.

4    (*See* MCC at 15; Am. Compl. ¶¶ 104-17, 125-132.) Although there may be a nuanced

5    difference between the relief available to the 30-Day Subclass and the 90-Day Subclass

6    (*see* 2/10/16 Order at 26 n.19), this legal question will at most generate one answer—yes

7    or no—for each putative subclass. This legal issue is thus a "common contention" that is

8    "capable of classwide resolution." *Dukes*, 564 U.S. at 350.

9    The core factual question in this case asks to what degree USCIS fails to timely

10   adjudicate EAD applications. (*See* MCC at 15.) Although this inquiry appears ripe for a

11   straightforward answer, the current proposed subclass definitions render the question

12   "[in]capable of classwide resolution." *Id.* As exemplified by Individual Plaintiffs,

13   Defendants' records will provide some common evidence relevant to that question. (*See,*

14   *e.g.*, A.R.s (Dkt. ## 38, 67 to 67-8.) However, the proposed subclass definitions suffer

15   from several flaws that necessitate a substantial individualized inquiry into the timeliness

16   of USCIS's adjudications.

17   As Defendants argue, the timeliness of USCIS's adjudication requires an

18   individualized inquiry to determine in what circumstances the 30- or 90-day adjudication

19   period was tolled or reset.[18]  (MCC Resp. at 15 (citing 8 C.F.R. §§ 103.2(b)(10),

20

21   _____

22   [18] Defendants also make the broader argument that of the 40 or more types of aliens
     eligible to seek an EAD, a panoply of diverse factual scenarios arise that render some applicants
     eligible for an EAD and some applicants ineligible. (*See* MCC Resp. at 14 (citing 8 C.F.R.

ORDER- 42

208.7(a)(2)) (arguing that depending on the type of EAD applicant, applicant-caused

delay, failure to provide initial evidence, rescheduling requests, requests for evidence,

and missing a biometric appointment may toll or reset the relevant adjudicatory

deadline).)  The proposed subclasses exclude most, but not all, individuals whose

adjudicatory time period is tolled or reset.  For instance, the 90-Day Subclass excludes

EAD applications based on "Deferred Action for Childhood Arrivals, U or T visa

applications, and self-petitions under the Violence Against Women Act . . . until USCIS

has determined eligibility for the underlying immigration benefit or granted deferred

action."  (MCC at 2.)  The 90-Day Subclass further categorically excludes individuals

who base their EAD application on an application for DACA renewal.  (*Id.* (excluding

"initial applications based on . . . requests to renew Deferred Action for Childhood

Arrivals").)  The 30-Day Subclass excludes EAD applicants who have "caused delay."

By excluding from the subclasses these individuals, Plaintiffs temper Defendants'

argument that the proposed subclasses lack commonality.

However, the subclass definitions fail to account for several scenarios that may

also toll the 30-day and 90-day EAD adjudication clocks.  For instance, if an EAD

application "is missing required initial evidence, or an applicant, petitioner, sponsor,

beneficiary, or other individual who requires fingerprinting requests that the

fingerprinting appointment or interview be rescheduled," the adjudication clock is tolled

§§ 274a.12(a), (c)).)  This argument sidesteps Plaintiffs' claim, which is that irrespective of an applicant's ultimate eligibility for an EAD, USCIS must either adjudicate applications within 90 days for members of the 90-Day Subclass and 30 days for members of the 30-Day Subclass, or issue interim EADs.  (*See, e.g.*, Am. Compl. ¶ 5.)

1   during the delay.  8 C.F.R. § 103.2(b)(10)(i).[19]  Each putative class member's claim

2   would need to be evaluated to see if this situation had occurred—a substantial

3   individualized undertaking.

4         Plaintiffs respond that in the event Section 103.2(b)(10)(i) tolls or resets the

5   adjudicatory period, "the deadline would not have expired, and the applicant would *not*

6   be a member of the class, at least until the problem is remedied and the day-count restarts

7   and reaches either 30 or 90 days."  (MCC Reply (Dkt. # 75) at 5 (citing 8 C.F.R.

8   § 103.2(b)(10)(i)).)  Plaintiffs do not clearly indicate which aspect of the class definition

9   they view as imposing this limitation.  However, the overarching, opening clause to the

10  class definition, which applies to both subclass definitions, arguably incorporates the

11  limitation.[20]  That clause includes in each subclass only noncitizens whose EAD

12  applications "were not or will not be adjudicated within the required regulatory

13  timeframe."  (MCC at 2.)  This language could be read to exclude individuals whose

---

15  [19] On August 29, 2016, an amended version of 8 C.F.R. § 103.2 went into effect, but the
16  amendment merely remedied several typographic errors in the prior version of the regulation.
    *Compare* 8 C.F.R. § 103.2(b)(10)(i) (effective Jan. 27, 2015) *with* 8 C.F.R. § 103.2(b)(10)(i)
    (effective Aug. 29, 2016).

17  [20] Neither subclass-specific definition incorporates this limitation.  The 90-Day Subclass
    proposes to include noncitizens "who have not received or will not receive a grant or denial of
18  their EAD applications within 90 days of filing."  (MCC at 2.)  The 30-Day Subclass similarly
    proposes to include noncitizen asylum applicants "who, absent any applicant-caused delay, have
19  not received or will not receive a grant or denial of their EAD applications within 30 days of
    filing."  (*Id.*)  Although this definition's reference to "applicant-caused delay" (*id.*) could be read
20  to except from the subclass definition the missing evidence or rescheduling circumstances that
    lead to tolling, *see* 8 C.F.R. § 103.2(b)(10)(i), the better reading is that "applicant-caused delay"
21  refers to one of the provisions of Section 208.7, *see* 8 C.F.R. § 208.7(a)(2) ("Any delay requested
    or caused by the applicant shall not be counted as part of these time periods . . . .").  Both
22  subclass definitions thus fail to exclude EAD applicants who have waited the requisite 30- or
    90-day period but whose adjudications are not overdue because of tolling or resetting.

1  adjudicatory deadline has tolled or reset because those individuals' "regulatory

2  timeframe" has not passed; it could also be read to include all individuals whose EAD

3  had not been adjudicated within the 30- or 90-day regulatory timeframe.  At most, this

4  argument merely transmutes the factual question underlying this case into a question of

5  class membership.[21]  However, it does nothing to eliminate the individualized inquiry

6  necessary to answer that factual question, and accordingly moves the court no closer to

7  concluding that "a classwide proceeding" in this case would "generate common answers

8  apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350.

9      Ultimately, whether USCIS has "unlawfully withheld or unreasonably delayed"

10  action, 5 U.S.C. § 706(1), or owes a "duty . . . to the plaintiff[s]," 28 U.S.C. § 1361, goes

11  to the merits of the APA and Mandamus Act claims, respectively.  But the court's

12  "rigorous analysis" under Rule 23 "[f]requently . . . entail[s] some overlap with the merits

13  of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351.  Here, Plaintiffs

14

---

15      [21] As Plaintiffs appear to read this limitation, it renders the class fail-safe.  A fail-safe

16  class is one with a definition that aligns with the elements of the class's claim such that finding
    no liability for the defendants would necessarily exclude all members from the class.  *See In re*

17  *AutoZone, Inc. Wage & Hour Emp't Practices Litig.*, 289 F.R.D. 526, 545-46 (N.D. Cal. 2012);
    *see also Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010).  Fail-safe classes

18  are problematic because they preclude a defendant in a class action from obtaining a binding
    judgment on the merits against the would-be class members.  *See AutoZone*, 289 F.R.D. at

19  545-46; *see also Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)
    (holding a class constituted "an improper fail-safe class that shields the putative class members

20  from receiving an adverse judgment" by defining the class in such a way that "[e]ither the class
    members win or, by virtue of losing, they are not in the class and, therefore, not bound by the

21  judgment"); *Genenbacher v. CenturyTel Fiber Co. II*, 244 F.R.D. 485, 487-88 (C.D. Ill. 2007)
    (finding that a proposed class "fail[ed]" to meet the requirements of Rule 23(c)(3) because the

22  Court cannot enter an adverse judgment that is enforceable against at least some of the proposed
    class members"); *but see AutoZone*, 289 F.R.D. at 546 ("[I]t is not clear that the Ninth Circuit
    forbids fail-safe classes.").

1    acknowledge that certain circumstances toll or reset the adjudication timetable (*see, e.g.*,

2    MCC Reply at 5), but Plaintiffs provide no evidence of the frequency with which this

3    occurs (*see generally* MCC); *see also* 2016 Ombudsman Report at 61-62 (indicating that

4    in fiscal year 2015, 449,307 EAD applications were adjudicated after more than 90 days,

5    but failing to apportion between delays that "are due to the customer's failure to file

6    timely or provide required documentation" and "other delays [that] occur through no fault

7    of the customer"). The court will not permit Defendants' speculation to defeat class

8    certification. *Agne*, 286 F.R.D. at 568. However, the onus is on Individual Plaintiffs to

9    come forward with evidence demonstrating that the timeliness of adjudication is "a

10   common question of liability that can be resolved 'in one stroke' and 'is central to the

11   validity of . . . the [class] claim.'"[22] *Id.* (alterations in original) (quoting *Dukes*, 564 U.S.

12

13   _____

14   [22] At oral argument, Plaintiffs cited *Walters v. Reno* as an analogous case in which this
     court and the Ninth Circuit found the commonality element satisfied. *See Walters v. Reno*
     (*Walters I*), No. C94-1204C, 1996 WL 897663 (W.D. Wash. Oct. 2, 1996); *Walters v. Reno*

15   (*Walters II*), 145 F.3d 1032 (9th Cir. 1998). In *Walters I*, Judge Coughenour certified a class of
     "[a]ll non-citizens who have or will become subject to a Final Order under § 274C of the INA

16   because they received notice forms that did not adequately advise them of their rights, of the
     consequences of waiving their rights or of the consequences of failing to request a hearing."
     *Walters I*, 1996 WL 897663, at *1. This definition "limit[ed] the class to those who became

17   subject to a final order through their failure to request a hearing, and who failed to request a
     hearing because their notice forms did not adequately advise them of their rights or the

18   consequences of failing to exercise those rights." *Id.* By so limiting the class, Judge
     Coughenour excluded class members who "received constitutionally adequate notice" and thus

19   lacked a claim. (*Id.*) Here, in contrast, the proposed class definition fails to limit the class
     members to individuals whose claim has accrued.

20       In *Walters II*, the Ninth Circuit affirmed Judge Coughenour's conclusion regarding
     commonality because "[d]ifferences among the class members with respect to the merits of their

21   actual document fraud cases . . . are simply insufficient to defeat the propriety of class
     certification." 145 F.3d at 1046 ("What makes the plaintiffs' claims suitable for a class action is

22   the common allegation that the INS's procedures provide insufficient notice."). The Ninth
     Circuit decided *Walters II* more than a decade before the Supreme Court acknowledged that the

1   at 350); *see also Dukes*, 564 U.S. at 350 ("A party seeking class certification must

2   affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to

3   prove that there are in fact sufficiently numerous parties, common questions of law or

4   fact, etc.").  The court cannot make this conclusion based on the anecdotal evidence in

5   the record and thus cannot conclude that Individual Plaintiffs satisfy the commonality

6   requirement.[23]

7        The court has discretion to "construe the complaint or redefine the class to bring it

8   within the scope of Rule 23."  7A Charles Alan Wright & Arthur R. Miller, *Federal*

9   *Practice and Procedure* § 1759 (3d ed. 2004); *see also Powers v. Hamilton Cty. Pub.*

10   *Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007); *Wolph v. Acer Am. Corp.*, 272 F.R.D.

11   477, 483 (N.D. Cal. 2011).  However, the court does not readily identify such a

12   modification.  As illustrated by the already cumbersome proposed subclass definitions,

13   satisfying Rule 23 is complex in light of the statutory and regulatory scheme at issue and

14   the discretion Defendants have to interpret that regime.  However, in light of the court's

15   conclusion that the other Rule 23 requirements are met, counsel's familiarity and facility

16   _____

17   "rigorous analysis" performed at the Rule 23 stage frequently "will entail some overlap with the
     merits of the plaintiff's underlying claim."  *Dukes*, 564 U.S. at 351.  In the instant case, unlike in

18   *Walters II*, Plaintiffs have failed to show that factual differences between putative class members
     do not preclude class adjudication.

19        [23] In their argument supporting numerosity, Plaintiffs point out that Defendants uniquely
     possess information pertinent to class certification.  (*See* MCC at 8.)  Plaintiffs first moved for

20   class certification the same day they filed their complaint (*see* Dkt. ## 1, 5), and Plaintiffs again
     moved for class certification the day after filing their amended complaint (*see* Dkt. ## 58-59.)

21   Plaintiffs make no argument that they sought data from Defendants on the prevalence of tolling
     or resetting deadlines pursuant to 8 C.F.R. § 103.2(b)(10)(i).  The court will not make

22   unsupported inferences or lower Plaintiffs' burden solely because Plaintiffs have performed
     inadequate discovery.

1    with the regulatory scheme at issue, and the potential for Individual Plaintiffs to refine

2    their class definitions and collect further evidence supporting commonality, the court

3    grants Individual Plaintiffs leave to renew their class certification motion in a manner that

4    resolves the definitional and evidentiary issues associated with commonality.

5            *c.   Typicality*

6            "[R]epresentative claims are 'typical' if they are reasonably co-extensive with

7    those of absent class members; they need not be substantially identical." *Hanlon*, 150

8    F.3d at 1020.  "Typicality refers to the nature of the claim or defense of the class

9    representative, and not to the specific facts from which it arose or the relief sought."

10   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Nonetheless, the

11   "commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457

12   U.S. at 157 n.13.  "Both serve as guideposts for determining whether under the particular

13   circumstances maintenance of a class action is economical and whether the named

14   plaintiff's claim and the class claims are so interrelated that the interests of the class

15   members will be fairly and adequately protected in their absence." *Id.*  In determining

16   typicality, courts consider "whether other members have the same or similar injury,

17   whether the action is based on conduct which is not unique to the named plaintiffs, and

18   whether other class members have been injured by the same course of conduct." *Hanon*,

19   976 F.2d at 508.

20          Aside from the Individual Plaintiffs that the court dismissed above, Plaintiffs

21   convincingly argue that as of the filing of the complaint, all Individual Plaintiffs suffered

22   the same injury as the putative class—a wait beyond the regulatory deadline for EAD

1    adjudication.  (MCC at 16-17.)  Defendants respond with examples of Individual

2    Plaintiffs that Defendants contend are not typical of the putative classes.  (MCC Resp. at

3    16-17.)  For instance, Defendants argue that Ms. Salmon and Ms. Diaz Marin's "own

4    mistake[s]" caused their EAD delays.  (*Id.*)  According to Defendants, Ms. Salmon

5    "incorrectly filed her application with the Vermont Service Center, rather than with the

6    Chicago Lockbox."  (*Id.* (citing Salmon A.R. (Dkt. # 67-7) at 7).)  Ms. Diaz Marin erred,

7    according to Defendants, by "incorrectly indicating that she was the recipient of a U

8    nonimmigrant visa, rather than the recipient of deferred action."  (*Id.* at 17 (citing Diaz

9    Marin A.R. (Dkt. # 67-2) at 8).)

10          Even assuming they were applicant-caused, the minor mistakes in Ms. Salmon's

11   and Ms. Diaz Marin's applications minimally impacted the roughly 200 days that USCIS

12   took to adjudicate their EAD applications.  (Salmon A.R. at 6; Diaz Marin A.R. at 8.)  In

13   other words, Defendants have described "the specific facts from which" Ms. Salmon's

14   and Ms. Diaz Marin's claims arose, but Defendants' argument does not undermine the

15   conclusion that "the nature of the claim or defense of the class representative[s]" is

16   typical of the putative class.  *Hanon*, 976 F.2d at 508.  Accordingly, although these

17   examples provide a modicum of further evidence that undermines commonality, *see*

18   *supra* § III.B.3.b., they otherwise fail to call typicality into question, *see Falcon*, 457 U.S.

19   at 157 n.13 ("The commonality and typicality requirements of Rule 23(a) tend to

20   merge."); (MCC Resp. at 17 ("These unique factual patterns amongst just 11 named

21   plaintiffs demonstrate the variety of factual situations experienced by applicants for

22   EADs and the filing mistakes made by EAD applicants.").

1    Defendants' other arguments in opposition to typicality are similar and no more

2    persuasive, and the court concludes that Individual Plaintiffs are typical of the subclasses

3    they seek to represent.

4        *d. Adequacy*

5        The parties also dispute whether Individual Plaintiffs would "fairly and adequately

6    protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Defendants contend that

7    several types of EAD applicants have interests that are misaligned with Individual

8    Plaintiffs' interests.[24]  (MCC Resp. at 18-19.)  Specifically, Defendants contend that

9    Individual Plaintiffs inadequately represent H-4-based EAD applicants, initial TPS-based

10   EAD applicants, spouses and children of diplomats and dignitaries, students with an F-1

11   visa who apply for pre-completion Optional Practical Training, and certain parolees. (*Id.*

12   at 18-21.)

13       Defendants first argue that USCIS's "90 day period to adjudicate the EAD

14   application" of an H-4 applicant "will commence on the latest date that a concurrently

15   filed benefit request is approved." (*Id.* at 19 (citing 8 C.F.R. § 214.2(h)(9)(iv)).)

16   However, EAD applications grounded in H-4 applications are not governed by 8 C.F.R.

17   § 274a.13, which is the regulation by which Individual Plaintiffs propose to define

18   membership in the 90-Day Subclass.  (MCC at 2 (including in the 90-Day Subclass

19   _____

20       [24] As the Supreme Court has recognized, "the commonality and typicality
     requirements . . . tend to merge with the adequacy-of-representation requirement, although the
21   latter requirement also raises concerns about the competency of class counsel and conflicts of
     interest." *Falcon*, 457 U.S. at 157 n.13.  The commonality concern that the court expressed
22   above, *see supra* § III.B.3.b., extends to the adequacy requirement, but the court does not restate
     that issue here.

1  noncitizens who "[h]ave filed or will file applications for employment authorization

2  under 8 C.F.R. § 274a.13"")); *see* 8 C.F.R. § 274a.13(d) (excepting from the 90-day

3  deadline employment authorization considered pursuant to 8 C.F.R. § 214.2(h)(9)(iv)); 8

4  C.F.R. § 214.2(h)(9)(iv) (describing the EAD application process and adjudicatory

5  deadline for "[t]he spouse and children of an H nonimmigrant," who may be admitted "as

6  H-4 nonimmigrants"). Defendants correctly argue that the regulations provide for a

7  different calculation of H-4 applicants' adjudicatory deadline. 8 C.F.R. § 214.2(h)(9)(iv)

8  ("If such [EAD] Application . . . is filed concurrently with another related benefit

9  request(s), in accordance with and as permitted by form instructions, the 90–day period

10  described in 8 CFR § 274.13(d) will commence on the latest date that a concurrently filed

11  related benefit request is approved."). However, because the subclass definition excludes

12  these applicants, whether Individual Plaintiffs would adequately represent H-4-based

13  EAD applicants is irrelevant.

14        Defendants' argument that Individual Plaintiffs inadequately represent initial

15  TPS-based EAD applicants is also unpersuasive. (*See* MCC Resp. at 19-20.) TPS-based

16  applicants who make a prima facie showing of TPS eligibility are immediately granted

17  temporary benefits. 8 C.F.R. §§ 244.5(b), 244.10(a). Defendants posit that USCIS

18  adjudicates Form I-765 only after making this prima facie determination, and Defendants

19  therefore argue that much like a DACA applicant, the 90-day adjudicatory clock begins

20  only after USCIS makes the prima facie evaluation. (MCC Resp. at 20.) At most, this

21  argument reinforces the court's conclusion regarding commonality, but it does not

22

1  demonstrate that Individual Plaintiffs would inadequately represent TPS-based EAD

2  applicants.

3       The court is also unpersuaded by Defendants' hypotheticals regarding spouses and

4  children of diplomats and dignitaries, students with F-1 visas, and parolees.  (MCC Resp.

5  at 20-21.)  Defendants argue that Individual Plaintiffs' success on behalf of the putative

6  class would be unhelpful to certain members of those groups.[25]  But Defendants'

7  speculation cannot defeat class certification.  *Agne*, 286 F.R.D. at 568.  Moreover, even

8  assuming Defendants' posited scenarios occur with some regularity, at most they show

9  that not all class members would benefit from a successful class action.  This showing

10  falls short of constituting a "conflict[] of interest between named parties and the class

11  they seek to represent," and discerning such conflicts is the purpose of the adequacy

12  requirement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

13       Finally, Defendants set forth a more overarching argument that allocation of

14  insufficient resources may create conflicting interests between subgroups of the

15  subclasses.  (MCC Resp. at 21-22 (arguing that because USCIS is "a self-funded agency

16  with finite resources," a spike in one type of EAD application could lead the agency to

17  _____

18  [25] (MCC Resp. at 20 ("[Certain spouses and children of diplomats and foreign dignitaries]
   have an interest that could conflict with the Plaintiffs' request that a decision be issued within 90
19  days of filing with USCIS, if for instance, these applicants wanted a decision within 90 days of
   filing with the State Department."), 21 ("[I]f the [F-1 student] applicant files less than 90 days
20  before the job begins, then the 2 month employment period may have already begun, or even
   expired, by the time USCIS completes adjudication of the Form I-765.  In this case, issuing an
21  interim EAD for a time period that is different from the period that [the applicant] requested to
   work would not make any sense and would not redress any injury."), 21 ("If they are only here
22  for a short time, USCIS may not be able to adjudicate the application before the parolee would
   have to return to his or her home country.").

1    pay less attention to other types of EAD applications).)  The court recognizes that

2    Defendants have limited resources.  However, to the extent the putative class obtains

3    injunctive relief in this class action, the sufficiency of Defendants' resources to effectuate

4    that relief is a function of budgeting and the regulatory timelines established by

5    Defendants, not this court's determination that Defendants must abide by those timelines.

6          Accordingly, the court concludes that aside from the commonality issues noted

7    above, Individual Plaintiffs and their proposed counsel constitute adequate class

8    representatives.[26]

9          *e.  Common Grounds*

10         Plaintiffs contend that their class action satisfies Rule 23(b)(2) because Defendants

11   have "acted or refused to act on grounds that apply generally to the class, so that final

12   injunctive relief or corresponding declaratory relief is appropriate respecting the class as

13   a whole."  Fed. R. Civ. P. 23(b)(2).  "Class certification under Rule 23(b)(2) is

14   appropriate only where the primary relief sought is declaratory or injunctive."  *Zinser v.*

15   *Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001).  The court treats

16   [p]redominance and superiority a[s] self-evident," *Dukes*, 564 U.S. at 363, and requires

17   "[o]nly a showing of cohesiveness of class claims," *Herskowitz v. Apple, Inc.*, 301 F.R.D.

18   460, 481 (N.D. Cal. 2014) (citing *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625,

19   635 (W.D. Wash. 2011)).

20   _____

21        [26] At oral argument, the court expressed its hesitancy to appoint as class counsel a

22   member of NWIRP because NWIRP is an Organizational Plaintiff to this action.  However, because the court dismisses Organizational Plaintiffs, *see supra* § III.A.5., that concern is moot.

1   Here, the only relief Plaintiffs seek is declaratory and injunctive.  Plaintiffs seek a

2   declaration that Defendants have violated the applicable EAD regulations and an order

3   prospectively requiring Defendants to comply with the regulatory timelines set forth in

4   those regulations.  (Am. Compl. at 37-39; *see also* MCC at 21.)  Those claims are

5   sufficiently cohesive to satisfy Rule 23(b)(2).  *See Herskowitz*, 301 F.R.D. at 481.

6   Furthermore, in opposing class certification, Defendants do not argue that this case is

7   unsuited to proceed as Rule 23(b)(2) class action.  (*See generally* MCC Resp.)

8   Therefore, the court concludes that Rule 23(b)(2) is satisfied.

9   **C.    Leave to Renew Motion**

10   Although Plaintiffs have previously moved for class certification, this order marks

11   the first time the court has addressed class certification on the merits.  (*Cf.* 2/10/16 Order

12   at 35-36 (declining to decide Plaintiffs' motion for class certification after dismissing two

13   of the three putative class representatives for lack of subject matter jurisdiction).)  After

14   analyzing commonality, the court finds Individual Plaintiffs have not demonstrated that

15   their current class definitions satisfy that element.  *See supra* § III.B.3.b.  The confluence

16   of a complex regulatory scheme, necessary deference to agency interpretations, and

17   Individual Plaintiffs' expansive proposed class may render this Rule 23(a) issue

18   intractable.  Indeed, the court's own efforts to cure the flaws in the subclass definitions

19   proved fruitless.  In sum, Individual Plaintiffs may have bitten off more than Rule 23

20   permits them to chew.

21   However, the court will provide putative class counsel an opportunity to cure the

22   Rule 23 deficiencies identified herein by modifying the subclass definitions, providing

1   further evidence, and renewing their motion for class certification.[27]  The court GRANTS

2   Individual Plaintiffs leave to renew their motion for class certification no later than 30

3   days from the date of this order.[28]

4                           **IV.    CONCLUSION**

5          Based on the foregoing analysis, the court GRANTS in part and DENIES in part

6   Defendants' motion to dismiss (Dkt. # 69), DENIES without prejudice Individual

7   Plaintiffs' motion for class certification (Dkt. # 59), and GRANTS Individual Plaintiffs

8   leave to renew their motion for class certification within 30 days of the date of this order.

9          Dated this 5th day of October, 2016.

10

11

12                                              _____
                                                JAMES L. ROBART
13                                              United States District Judge

14

15

16

17

18   _____

19          [27] In this order, the court identifies the possible utility of further discovery.  *See supra*
     n.23.  Such further discovery may warrant granting Individual Plaintiffs more than 30 days to
20   renew their motion for class certification.  The court will consider granting an extension of
     Plaintiffs' deadline on an appropriate motion.

21          [28] If Plaintiffs fail to timely renew their motion for class certification, the court will deny
     the motion for class certification with prejudice and, on an appropriate motion, determine
22   whether the remaining Individual Plaintiffs' claims are subject to dismissal.  *See supra* § III.A.4.