UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILMAN GONZALEZ ROSARIO, et al.,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, et al.,<br><br>　　　　　　　　Defendants. | CASE NO. C15-0813JLR<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |

## I.　INTRODUCTION

Before the court are (1) named Plaintiffs A.A., Antonio Machic Yac, and W.H. and class members' (collectively, "Plaintiffs") motion for summary judgment (Pls. MSJ (Dkt. # 118)); and (2) Defendants United States Citizenship and Immigration Services ("USCIS"), United States Department of Homeland Security ("DHS"), Director of USCIS L. Francis Cissna, and Secretary of DHS Kirstjen Nielsen's (collectively,

"Defendants") motion for summary judgment (Defs. MSJ (Dkt. # 119)). Each party opposes the other's motion. (*See* Pls. Resp. (Dkt. # 123); Defs. Resp. (Dkt. # 122).) The court has considered the motions, the parties' submissions in support of and in opposition to the motions, the administrative record, and the applicable law. The court also heard oral argument from parties on July 26, 2018. (*See* Min. Order (Dkt. # 126).) Being fully advised, the court GRANTS Plaintiffs' motion and DENIES Defendants' motion.

## II.   BACKGROUND

Plaintiffs seek to compel USCIS to abide by regulatory deadlines for adjudicating noncitizens' applications for employment authorization documents ("EADs"). (*See generally* Am. Compl. (Dkt. # 58).) The court reviews the regulatory structure governing the EAD application process before turning to the factual and procedural background of this case.[1]

### A.   Regulatory Structure

Asylum seekers can obtain an employment authorization prior to adjudication of their asylum applications. *See* 8 C.F.R. §§ 208.7(a)(1), 274a.12(c)(8), 274a.13(d); *see also Carballo v. Meissner*, No. C00-2145, 2000 WL 1741948, at *2 (N.D. Cal. Nov. 17, 2000). To do so, an individual must file Form I-765 with DHS and obtain an EAD, which is evidence that the holder is authorized to work in the United States. (Supp. Admin. Rec. ("SAR") (Dkt. ## 103-1, 103-2, 103-3, 103-4, 103-5) at 2-3.) Generally, an

//

---

[1] The court has previously detailed at length the background of this case. (*See* 2/10/16 Order (Dkt. # 55); 10/5/16 Order (Dkt. # 80); 7/18/17 Order (Dkt. # 95); 4/17/18 Order (Dkt. # 113).) Thus, here, the court recounts only the information pertinent to the instant motions.

individual must wait 150 days after filing an asylum application to file an initial EAD application. 8 C.F.R. § 208.7(a)(1). Upon receiving the initial EAD application, the regulation states that USCIS:

> shall have 30 days from the date of filing of the request [for] employment authorization to grant or deny that application, except that no employment authorization shall be issued to an asylum applicant prior to the expiration of the 180-day period following the filing of the asylum application filed on or after April 1, 1997.

*Id.* § 208.7(a)(1); *see also* 8 U.S.C. § 1158(d)(2).

**B.  Factual Background**

A.A., Mr. Machic Yac, and W.H. are initial asylum EAD applicants who allege that Defendants failed to adjudicate their EAD applications within the required 30-day period. (Am. Compl. ¶¶ 21, 23, 28, 57, 62, 81; *see also* Machic Yac AR (Dkt. # 67-6) at 3 (EAD application received on December 31, 2015, and adjudicated March 31, 2016); A.A. AR (Dkt. # 67) at 3 (EAD application submitted around January 12, 2016, and adjudicated March 16, 2016); W.H. AR (Dkt. # 38) at 42-50 (EAD application received on December 15, 2014, and adjudicated June 16, 2015).) There is no dispute that USCIS failed to meet its 30-day deadline, both for the named Plaintiffs and more broadly for class members. (*See* Defs. MSJ at 7 ("USCIS was not able to adjudicate 100 percent of initial asylum EADs within 30 days.").) Defendants' data reveals that from 2010 to 2017, USCIS met its 30-day deadline in only 22% of cases—that is, out of 698,096 total applications, USCIS resolved only 154,629 applications on time. (*See* SAR at 89-90.) In 2017, USCIS timely resolved only 28% of applications. (*See id.* at 90.)

//

1    USCIS made some changes in response to the need to more quickly adjudicate
2  EAD applications.  First, USCIS increased the validity period of an initial asylum EAD
3  from one year to two years.  *USCIS Increases Validity of Work Permits to Two Years for*
4  *Asylum Applicants*, U.S. Citizenship and Immigration Services (Oct. 6, 2016),
5  https://www.uscis.gov/news/alerts/uscis-increases-validity-work-permits-two-years-
6  asylum-applicants.  Second, USCIS provided checklists on its websites to assist
7  applicants who are submitting applications.  *Form M-1162, Optional Checklist for Form*
8  *I-765(c)(8) Filings Asylum Applications (With a Pending Asylum Application) Who Filed*
9  *for Asylum on or after January 4, 1995*, U.S. Citizenship and Immigration Services (July
10 17, 2017), https://www.uscis.gov/system/files_force/files/form/m01162.pdf.

**C.     Procedural Background**

Plaintiffs brought a putative class action on May 22, 2015.  (*See* Compl. (Dkt. # 1).)  On August 10, 2015, Defendants moved to dismiss the suit and argued that the "30-day regulatory deadline is discretionary."  (2/10/16 Order at 21; *see* MTD (Dkt. # 34) at 10-13.)  The court disagreed and held that not only did the "plain language of the regulation favor[] a mandatory interpretation," but "[r]eading the 30-day timeline as mandatory also comports with the regulation's overall goals and related regulations."  (2/10/16 Order at 24; *see also id.* at 24-26.)

On July 18, 2017, the court granted Plaintiffs' motion for class certification and certified the following class:

> Noncitizens who have filed or will file applications for employment authorization that were not or will not be adjudicated within . . . 30 days . . . and who have not or will not be granted interim employment authorization.

> [This class] consists of only those applicants for whom 30 days has accrued or will accrue under the applicable regulations, 8 C.F.R. §§ 103.2(b)(10)(i), 208.7(a)(2), (a)(4).

(7/18/17 Order at 26-27.) The court additionally reiterated that the regulatory 30-day deadline is "mandatory" and found "no reason to differentiate those mandatory regulatory deadlines from the mandatory statutory deadlines in [Ninth Circuit precedent]." (*Id.* at 21.) The court explicitly rejected Defendants' argument that the regulations only created a mandatory duty to act and not a mandatory timeline to follow, stating that it will not entertain "Defendants' effort to relitigate whether the 30-day deadline is directory or mandatory." (*Id.* at 21 n.10.)

Subsequently, both parties sought to supplement the administrative record. (Defs. Mot. to Supp. (Dkt. # 103); Pls. Mot. to Supp. (Dkt. # 104).) The court granted in part and denied in part both motions (4/17/18 Order at 13-14), and parties accordingly filed a supplemental administrative record (*see* Not. of SAR (Dkt. # 116)).

Both parties then moved for summary judgment. (*See* Pls. MSJ; Defs. MSJ.) The court now addresses both motions.

### III.   ANALYSIS

The parties agree that USCIS has a duty to adjudicate initial EAD applications within 30 days. (*See* Pls. Reply (Dkt. # 124) at 1; Defs. MSJ at 9 (acknowledging that the court "has previously held that Defendants have a mandatory duty to adjudicate initial EAD applications within 30 days").) The parties further agree that USCIS violates this duty. (*See* Pls. Reply at 1-2; Defs. MSJ at 9 (acknowledging that "they are unable to meet that [30-day] requirement for every application").) Thus, the sole remaining

question is what remedy is proper. (*See* Pls. Resp. at 2; Defs. MSJ at 9 (stating "a question for this [c]ourt remains: what remedy is appropriate?").)

Plaintiffs request (1) a declaration that USCIS has violated the mandatory deadline, and (2) an injunction compelling Defendants to comply with the regulation. (Pls. MSJ at 11.) Defendants do not dispute the declaratory relief Plaintiffs request.[2] (*See* Defs. MSJ; Defs. Resp.) Instead, Defendants focus their arguments on the impropriety of injunctive relief. (*See* Defs. MSJ at 9-15.) The court disagrees and finds that an injunction compelling agency action is appropriate here.

The Administrative Procedure Act ("APA") provides that a court may compel "agency action unlawfully withheld or unreasonably delayed."[3] 5 U.S.C. § 706(1). A court may compel agency action when "an injunction is necessary to effectuate the congressional purpose behind the statute." *Badgley*, 309 F.3d at 1177 (citing *TVA v. Hill*, 437 U.S. 153, 194 (1978)). In *Badgley*, the Ninth Circuit considered whether an injunction should issue for an agency's failure to comply with a deadline laid out in the

//

---

[2] In reply, Defendants argue for the first time that a declaratory judgment "is not appropriate in this case." (Defs. Reply (Dkt. # 125) at 1 (bolding removed).) As a preliminary matter, the court "need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). But even if the court considered Defendants' argument, Defendants merely purport that a declaratory judgment "alone would not be sufficient" but provide no support that this alleged insufficiency should prevent a declaratory judgment from issuing. (*See* Defs. Reply at 2.) Indeed, the court finds that the parties are "immersed in a substantial controversy regarding the proper interpretation of" the regulations at issue and thus, the court has the authority to issue a declaratory judgment regarding the rights of Plaintiffs. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1172-73 (9th Cir. 2002).

[3] Both parties recognize that an injunction pursuant to the APA is identical to mandamus relief under 28 U.S.C. § 1361. (*See* Pls. MSJ at 6-7; Defs. MSJ at 8.)

Endangered Species Act (the "ESA"). *See id.* at 1176-78. Because the clear purpose of the ESA was to assure adequate protection for endangered species, and violation of the ESA deadlines impeded that purpose, the court held that the ESA "removed the traditional discretion of courts in balancing the equities before awarding injunctive relief." *Id.* at 1177. In other words, because the statute was "abundantly clear that the balance [of equities] has been struck in favor of affording endangered species the highest of priorities," it removed the usual discretion a court exercises in determining whether an injunction should issue and compelled the court to grant injunctive relief. *Id.* at 1177-78 (internal quotation marks omitted) (quoting *TVA*, 437 U.S. at 194).

As the court has previously found (*see* 2/10/16 Order at 24), one of the "chief purposes" of the 30-day deadline, as part of the larger regulatory amendments issued in January 1995, was "to ensure that bona fide asylees are eligible to obtain employment authorization as quickly as possible," 62 Fed. Reg. at 10,318 (1997). The focus on expediency is reinforced by how the agency described the proposed rule: "The INS will adjudicate these applications for work authorization within 30 days of receipt, regardless of the merits of the underlying asylum claim." 50 Fed. Reg. at 14,780 (1994). This elevation of the 30-day deadline above the merits of the underlying asylum claim reflects, as in *Badgley*, that the balance of equities has been struck in favor of adhering to the deadline so that applicants can obtain employment authorization. *See* 309 F.3d at 1177.

The goal of timely employment authorization is further evidenced by the reason why the 30-day deadline was implemented. The January 1995 amendments imposed a 150-day waiting period before an asylum seeker may submit an initial EAD application.

50 Fed. Reg. at 14,780.  But even though the agency imposed a waiting period, it made clear that "[i]deally . . . few applicants would ever reach the 150-day point."  *Id.*  Indeed, the INS selected 150 days because it was a period "beyond which it would not be appropriate to deny work authorization to a person whose claim has not been adjudicated."  *Id.*  Thus, the purpose of promulgating the 30-day deadline on top of that 150-day waiting period was to cabin what was already—in the agency's view—an extraordinary amount of time to wait for work authorization.  *See id.*  This context further elucidates that the 30-day deadline was instituted to promote timeliness.

In light of the plain language and clear objectives behind the regulation at issue, the court concludes that, as in *Badgley*, it is "abundantly clear that the balance [of equities] has been struck in favor" of expedient adjudication of initial EAD applications so that asylum seekers may obtain work authorization when waiting—often for years—to have their asylum applications resolved.  *See* 309 F.3d at 1177; (*see* SAR at 93-95 (showing that asylum applicants wait at least two years, and sometimes, up to four years, for an asylum interview).)  Thus, much like *Badgley*, the court is compelled to issue injunctive relief.  *See* 309 F.3d at 1177.

Defendants attempt to distinguish *Badgley* on the basis that *Badgley* involved a deadline set by a congressional statute rather than an agency regulation.  (Defs. MSJ at 11-12.)  But it is settled law that "properly enacted regulations have the force of law and are binding on the government until properly repealed."  *Flores v. Bowen*, 790 F.2d 740, 742 (9th Cir. 1986).  And nothing in *Badgley* expressly limits its reasoning to statutes enacted by Congress.  *See* 309 F.3d at 1176-78.  Moreover, Defendants provide no

authority interpreting *Badgley* in the way they propose, either in their briefing or at oral argument. (*See* Defs. MSJ at 11-12.) Indeed, Congress, in its statutory directive, defers to the agency regulations to govern the process of granting work authorization. *See* 8 U.S.C. § 1158(d)(2) ("[S]uch authorization may be provided under regulation."). Thus, the court discerns no reason to differentiate the mandatory regulatory deadlines at issue here from the mandatory statutory deadlines in *Badgley*.

*Badgley* also forecloses Defendant's argument that the court should apply the six-factor reasonableness analysis from *Telecommunications Research & Action Center v. F.C.C.* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984). (*See* Defs. MSJ at 12-13 (urging the court to apply the *TRAC* factors).) As the court previously concluded (*see* 7/18/17 Order at 20-21), *Badgley* rejected the *TRAC* analysis when the law "specifically provide[s] a deadline for performance," *see* 309 F.3d at 1177 n.11; *see also Garcia v. Johnson*, No. 14-cv-01775-YGR, 2014 WL 6657591, at *12 (N.D. Cal. Nov. 21, 2014). Here, there is undisputedly a deadline established by regulation. *See* 8 C.F.R. § 208.7(a)(1). Thus, the court rejects the Defendants' contention that the *TRAC* factors should be applied.

But even if Defendants are correct that the *TRAC* factors apply, they weigh in favor of granting injunctive relief. The *TRAC* factors measure whether the agency has unreasonably delayed action, as is required to issue injunctive relief under the APA. 750 F.2d at 79-80; *see* 5 U.S.C. § 706(1); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016) (applying *TRAC* factors in the mandamus context to determine whether mandamus should issue). The factors include:

    (1) the time agencies take to make decisions must be governed by a "rule of reason," (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason, (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake, (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority, (5) the court should also take into account the nature and extent of the interests prejudiced by the delay, and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*TRAC*, 750 F.2d at 80 (internal citations omitted). Defendants discuss only their current efforts to meet the 30-day timeline and the reasons why they cannot achieve 100% compliance, both of which fall within the fourth *TRAC* factor.[4] (*See* Defs. MSJ at 13-15.) Specifically, Defendants cite "resource and logistical constraints in the face of an astronomical increase in both asylum applications and subsequent [EAD] applications" and the two changes they have made in an effort to comply: (1) extending the validity of initial asylum EADs; and (2) preparing a checklist for initial EAD applicants so that applications are properly filled out.[5] (*Id.* at 13-14.)

    Even accepting Defendants' assertions on their face and assuming that the fourth *TRAC* factor weighs against an injunction, that factor is outweighed by the remaining

---

[4] Although the Defendants urge the court to apply the *TRAC* factors, their briefing does not explicitly make arguments under each factor; instead, they raise general practical concerns involving their resources. (*See* Defs. MSJ at 12-15.) At oral argument, Defendants identified the fourth *TRAC* factor as the one most likely to encompass resource concerns, and in its own review of the factors, the court agrees that these practical concerns best fit into the fourth *TRAC* factor.

[5] Defendants also indicate that they are in the process of amending the regulations to eliminate the 30-day deadline. (Defs. MSJ at 8; Defs. Resp. at 3.) But the current regulation remains binding until it is properly repealed. *See Flores*, 790 F.2d at 742. Moreover, the status of the amendment is unclear, and its outcome is equally unclear. Thus, the court declines to rely on a potential amendment in its consideration of the instant motions.

ORDER - 10

factors. Most importantly, the overlapping third and fifth *TRAC* factors, both of which assess the impact of the agency's delay on the public welfare, strongly weigh in favor of an injunction. *See TRAC*, 750 F.2d at 80. As *TRAC* recognizes, delays are "less tolerable when human health and welfare are at stake." *Id.* And that is exactly what is at stake here: Asylum seekers are unable to obtain work when their EAD applications are delayed and consequently, are unable to financially support themselves or their loved ones. (*See* SAR at 3 (noting that asylum seekers "are not authorized to work unless they are specifically granted [EADs]").) This negative impact on human welfare is further compounded by the length of the USCIS's delay. For example, in 2017, 10,103 applications took over 121 days to adjudicate, on top of the 150 days those applicants already had to wait, unable to work, after filing their asylum application. (SAR at 90.)

The first and second *TRAC* factors additionally suggest that Defendants' delay is unreasonable. Although Congress has not included a timetable specific to EAD applications, it has stated that the final adjudication of the asylum application "shall be completed within 180 days after the date an application is filed." 8 U.S.C. § 1158(d)(5)(A)(iii). This timetable syncs up with the regulatory requirements—that after the asylum application has been pending for 150 days, the EAD application should be resolved in 30 days. *See* 8 C.F.R. § 208.7(a)(1). Yet, the agency is taking far longer than 30 days. (*See* Machic Yac AR at 3 (91 days); A.A. AR at 3 (about 64 days); W.H. AR at 42-50 (183 days).)

Considered in combination with the third and fifth factors, the court concludes that the totality of the *TRAC* factors indicates that Defendants' delay in resolving EAD

applications is unreasonable in these circumstances.[6] Accordingly, the court grants an injunction compelling Defendants to adhere to the 30-day deadline as laid out in 8 C.F.R. § 208.7(a)(1).

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiffs' motion for summary judgment (Dkt. # 118) and DENIES Defendants' motion for summary judgment (Dkt. # 119). The court FINDS that Defendants are in violation of 8 C.F.R. § 208.7(a)(1) and ENJOINS Defendants from further failing to adhere to the 30-day deadline for adjudicating EAD applications, as set forth in 8 C.F.R. § 208.7(a)(1). The court ORDERS Defendants to submit status reports every six (6) months regarding the rate of compliance with the 30-day timeline.

The court DIRECTS the Clerk to provisionally file this order under seal and ORDERS the parties to meet and confer regarding the need for redaction. The court further ORDERS the parties to jointly file a statement within ten (10) days of the date of this order to indicate any need for redaction.

Dated this 26th day of July, 2018.

JAMES L. ROBART
United States District Judge

---

[6] To the extent Defendants rely on resource constraints as a standalone argument, that argument is unavailing. The Supreme Court recently rejected a similar argument from an agency citing "a number of practical concerns." *Pereira v. Sessions*, --- U.S. ---, 138 S. Ct. 2105, 2118 (2018). The Court found these "meritless" considerations "do not justify departing from the [law's] clear text." *Id.* The court concludes the same here.